CREDIT COMPANY (Limited) OF LONDON, ENGLAND, *v.* ARKANSAS CENT. R. CO. and others.

*(Circuit Court, E. D. Arkansas.* October Term, 1882.)

1. RAILROADS—RECEIVER—CERTIFICATES OF INDEBTEDNESS—REPAIR OF ROAD.
    A court of equity may authorize the receiver of a railroad to issue certificates of indebtedness and make them a first lien upon the road, for the purpose of raising funds to make necessary repairs and improvements, but it is a power to be sparingly exercised; and when the road cannot be kept running without its exercise, except to a very limited extent, the sound practice is to discharge the receiver or stop running the road and speed the foreclosure.

**2. Same—Duty to Build Road.**

It is not a judicial duty to build railroads, and the assent of all the parties interested in the property cannot make it one, and there is no difference in principle between a court building a railroad by the issue of receiver's certificates, and making extensive and general repairs and betterments, approximating the original cost of construction by like means.

**3. Railway Mortgage—Beneficiaries Bound.**

In the absence of fraud the beneficiaries in railway mortgages are bound by what is done by their trustee.

**4. Railroad Bonds—Foreclosure.**

Where a holder of railroad bonds alleged the trustee had filed a bill and obtained a decree of foreclosure for the principal of the bonds not due, as well as for the interest which was due, without the written request of the holders of one-third in amount of the bonds, which it was claimed was a necessary prerequisite by the terms of the mortgage to the exercise of the power to declare the principal debt due, and sought for this reason to avoid the foreclosure proceedings, *held*, (1) that it was competent for the trustee to file a bill to foreclose for the interest due; (2) that the plaintiff ratified the action of its trustee by filing and proving in the master's office, in the foreclosure proceedings, more than one-third in amount of all the bonds issued; and (3) that the absence of such a requisition did not affect the jurisdiction of the court, and a decree for a larger sum than was due was error merely, to be corrected on appeal, and that as the error was one of which the trustee could not complain, and there was no fraud, the bondholders were as much bound as the trustee, and could not avoid the decree, on this ground, in any form of proceeding.

**5. Same—Effect of Laches.**

The effect of laches is not avoided by a general averment that the plaintiff was ignorant of the facts until a short time before the bill was filed. A general allegation of ignorance at one time and knowledge at another is of no effect. If the plaintiff made any particular discovery, it should be stated when it was made, what it was, how it was made, and why it was not made sooner.

**6. Same—Foreclosure—Sale under.**

When the property of a railroad company is sold under a decree of foreclosure, at which all persons are authorized to bid, the fact that it is purchased by the president of the company in his individual right will not in itself raise a trust relation between him and a holder of the bonds of the company which will entitle the latter to treat him as a trustee of the property so purchased.

**7. Same—Purchaser as Trustee.**

One claiming the right to avoid a purchase made by another at a judicial sale, or of treating the purchaser as a trustee, and availing himself of the purchaser's bid, cannot delay the assertion of this right to enable him to decide in the light of subsequent events whether he would or not be profited by its assertion.

**8. Pleading—Laches Need not be Pleaded.**

Laches need not be pleaded. If the cause as it appears on the hearing is liable to the objection, the court will refuse relief without inquiring whether there is a demurrer, plea, or answer setting it up.

In Equity.

*N. & J. Erb,* for plaintiffs.

*U. M.* and *G. B. Rose,* and *C. C. Waters,* for defendants.

CALDWELL, J. The Arkansas Central Railroad Company was formed for the purpose of constructing a railroad from Helena to Little Rock, with a branch to Pine Bluff. The chief ultimate promoters of this enterprise were Stephen W. Dorsey and J. E. Gregg. Dorsey was the president of the company, and its financial agent and manager, and generally controlled and conducted all the affairs of the corporation.

What is commonly called an exhaustive contract was entered into between the company and J. E. Gregg & Co. for the construction of the road, by the terms of which Gregg & Co. were to build the road for all its stock subscriptions and other assets, and a majority of its stock.

The directors of the railroad company and all its officers, except the president, seem never to have had more than a mere nominal existence after the making of this contract. From that time Gregg & Co. were regarded as owners of the road, and its assets in hand, as well as all that might thereafter be acquired.

Dorsey was a member of this firm also, and in the double capacity of president of the railroad company and a member of the firm of Gregg & Co. he seems to have managed the financial affairs of both.

The company executed a mortgage to secure its first-mortgage bonds, which were put upon the market and sold to the amount of $720,-000. The defendant, the Union Trust Company of New York, was the trustee in this mortgage. Dorsey went abroad to effect a sale of the bonds, and succeeded in placing most of them in London and Amsterdam.

By the fall of 1872, 48 miles of the road, which was a narrow gauge, had been completed in an imperfect manner. The work of construction was never resumed after that date. About this time Dorsey engaged actively in politics, and having been elected to the United States senate in the early part of 1873, and the assets and resources of the railroad company having been exhausted, he and the firm of J. E. Gregg & Co. soon ceased to take any further interest in the enterprise; and the defendant Johnson, who had at the solicitation of Dorsey invested some money in the concern of J. E. Gregg & Co., was elected president, and had the control and management of the road and the affairs of the company from that time until the commencement of proceedings to foreclose. The company had neither resources nor credit, and the earnings of the road were barely sufficient to keep it running, without making needed repairs and improve-

ments. The construction of the 48 miles of road seems to have absorbed the proceeds of the $720,000 first-mortgage bonds of the company, and of state aid and state levee bonds, and county and municipal subscriptions, amounting in the aggregate to some $2,000,000. The company was hopelessly insolvent. No interest was paid on its first-mortgage bonds, and on the twentieth day of September, 1876, the trustee filed a bill in the United States district court at Helena, then in the western district, to foreclose the mortgage. The bill alleged that the holders of one-third in amount of the bonds had requested the trustee to foreclose. A receiver was appointed, upon whose application Judge PARKER authorized the issue of receiver's certificates to the amount of $75,000, to make necessary repairs and improvements on the road. Between the date of this order and the next term of the court, Helena was transferred to this district, and the judge of this district rescinded the order authorizing the receiver to issue certificates. The rescinding order was not made because the road did not stand in need of repairs. It was notoriously true that its condition was such as to make it dangerous to life and property to run cars over it; ties were rotten, iron worn out, rolling stock in bad condition, bridges insecure, culverts washed out, and the road-bed in many places too low, resulting in overflows of the track and stoppage of trains. No repairs nor betterments had been put upon the road since it had been built.

It seems to be settled that a court of equity has the power in this class of cases to authorize its receiver to issue certificates of indebtedness, and make them a first lien upon the road, for the purpose of raising funds to make necessary repairs and improvements. *Wallace* v. *Loomis,* 97 U. S. 146, 162; S. C. 2 Woods, 506, under title, *Stanton* v. *Alabama & C. R. Co.*

But it is a power to be sparingly exercised. It is liable to great abuse, and while it is usually resorted to under the pretext that it will enhance the security of the bondholders; it not unfrequently results in taking from them the security they already have, and appropriating it to pay debts contracted by the court. The history of *Wallace* v. *Loomis, supra,* furnishes an instructive lesson on this subject.

This court has uniformly refused to arm its receivers with such a dangerous power. When the road cannot be kept running without its exercise, except to a very limited extent, the safe and sound practice is to discharge the receiver or stop running the road, and speed the foreclosure.

v.15,no.1—4

In the case of *Paine* v. *Little Rock & Ft. S. R. Co.*, April term, 1874, application was made to this court to authorize a receiver to issue certificates, which were to be a first lien, to build 60 miles of road, in order to earn a large and valuable land grant, which would lapse in a short time unless the road was completed. A majority in value of the first-mortgage bondholders concurred in the application; and the orders of the court in the case of *Stanton* v. *Alabama & C. R. Co.* 2 Woods, 506, (the case was not then reported,) and the case of *Kennedy* v. *St. Paul & Pac. R. Co.* 2 Dill. 448, were pressed upon the attention of the court. But the order was refused upon the ground that it was no part of the duty of a court of chancery to build railroads, and that the assent of all the parties interested in the property could not make it such. And there is no difference, so far as relates to this question, between building a railroad and making extensive and general repairs and bettorments, the cost of which sometimes approximates the cost of original construction. In the case referred to, of the Fort Smith Railroad, the proceedings to foreclose were speeded, and a decree rendered to meet the exigencies of the case, which the supreme court approved, and said "was a much more desirable plan" than to issue receiver's certificates. *Shaw* v *Railroad Co.* 100 U. S. 612.

Before the order authorizing the receiver to incur debts for repairs and other purposes was rescinded, he had incurred debts to the amount of some $22,000, chiefly for ties and a machine-shop. The ties were indispensable if trains were to be kept running, and the machine-shop was a necessary and valuable property to the road, and its use a necessity, though that could probably have been had without purchasing the property. A final decree of foreclosure was rendered on the seventeenth day of March, 1877. By the terms of the decree the purchaser was required to pay $40,000 in cash. This sum was required to pay the receiver's certificates, and other costs and expenses of foreclosure. Any amount bid in excess of the $40,000 could be paid in first-mortgage bonds. Unusual pains were taken to convey to the bondholders actual notice of the foreclosure proceedings, and holders of $661,000, out of a total of $720,000, of the first-mortgage bonds had actual notice of the foreclosure proceedings, and the time and place of sale. The present plaintiffs had opened negotiations looking to a foreclosure of the mortgage before the bill for that purpose was filed by the trustee; and before the sale under the decree it filed and proved in the master's office bonds to the amount of $461,-000, being the very bonds on which this suit is bottomed. The road

was sold at the master's sale for $40,000, to S. H. Horner, as trustee for A. H. Johnson, the then president of the railroad company, and superintendent of the road under the receiver.

The plaintiff, by its agent, had notice of this sale, and appeared, by its attorney, in court and moved to open the biddings for the road, and the court passed an order that the biddings would be opened if the present plaintiff or any person should advance the bid $5,000 during a period of 10 days allowed for that purpose. The plaintiff, or its agent, declined to open the biddings. In the mean time Johnson had grown sick of his bargain, and made application to the court to set aside the sale and permit him to withdraw the purchase money. This was refused, and the sale confirmed. Johnson then offered to turn the road over to the plaintiff, or any holders of the first-mortgage bonds who would pay him the amount of his bid within a period of some 50 days. This offer was communicated to the plaintiff by its agent, Sully, and declined.

It is clear, from the evidence, that the defendants Johnson and Horner and the citizens of Helena wished to have the bondholders purchase the road. They were extremely anxious that the road should be completed, and believed that its purchase by the bondholders would insure that result, and that nothing else would. After the plaintiff and other bondholders declined to take Johnson's purchase off his hands, he proceeded, as fast as he could raise means for that purpose, to put the necessary repairs and improvements upon the road, which embraced 50,000 new ties, 5 miles of new iron, the rebuilding of nearly all the bridges and culverts, raising the road-bed in many places, and extensive repairs of the rolling stock. He afterwards sold a half interest in the property to his co-defendant, John J. Horner. Not long after the purchase, railroad securities and property in the south appreciated very much, and, although the road in question was but a fragment, its value was enhanced by the general and unprecedented increase in the value of all railroad property. Its value was further enhanced by the construction of a trunk line—not projected when Johnson purchased—from Missouri to Texas, which connects with its western terminus at Clarendon, and by the extensive repairs and improvements put upon the road, which altogether made it worth from $100,000 to $200,000 at the time this suit was commenced, supposing it to be free from incumbrances prior in time to the mortgage under which defendants claim.

The bill, which was filed five years after the sale, seeks to charge Johnson as a trustee for the bondholders on general charges of fraud

against him, the Union Trust Company; and others, relating to the fore-closure and sale, and for alleged inadequacy of price. The latter charge was abandoned at the hearing, the counsel for the plaintiff conceding on the argument that the road sold for all it was worth in its then condition, and in view of the question of the lien for the state aid bonds.

The rule is well settled that in the absence of fraud the benefici-aries in railway mortgages are bound by what is done by their trustee.

"In such cases the trustee is in court for and on behalf of the bene-ficiaries; and they, though not parties, are bound by the judgment, unless it is impeached for fraud or collusion between him and the adverse party. The principle which underlies this rule has always been applied in proceedings relating to railway mortgages where a trustee holds the security for the benefit of the bondholders." *Kerrison* v. *Stewart*, 93 U. S. 155, 160. "The trustee of a railroad mort-gage represents the bondholders in all legal proceedings carried on by him affecting his trust, to which they are not actual parties, and whatever binds him, if he acts in good faith, binds them. If a bondholder not a party to the suit can under any circumstances bring a bill of review, he can only have such relief as the trustee would be entitled to in the same form of proceeding." *Shaw* v. *Railroad Co.* 100 U. S. 605, 611. Although the bill charges fraud in general terms upon the trustee, in connection with the foreclosure suit, there is not a syllable of evidence to support the charge.

One point much relied on at the hearing to support the bill was that the bill to foreclose was filed by the trustee without the written request of the holders of one-third in amount of the bonds then out-standing, as required by the twelfth article of the mortgage; and that the decree requiring the payment of the principal sum of the mort-gage debt was therefore erroneous. The late cases of the *Chicago, D. & V. R. Co.* v. *Fosdick*, 1 Sup. Ct. Rep. 10, United States supreme court, are cited in support of this contention. The ruling in those cases does not aid the plaintiff's case, for several reasons: (1) The mortgage in the case at bar contains an important provision on the subject which was not contained in the mortgage under consideration in the cases cited, and which would seem to authorize all that was done by the trustee, and the decree of the court for the whole debt. (2) It was undoubtedly competent for the trustee to file a bill to foreclose for the interest actually due, and that largely exceeded in amount the value of the road. (3) The railroad company does not complain of

the decree, and the plaintiff is estopped to do so by reason of having filed and proved in the master's office more than one-third in amount of all the bonds issued, with full knowledge of all the facts. This was a ratification of the action of the trustee. (4) If it be conceded that the requisition of the holders of one-third in amount of the bonds was indispensable to authorize a decree for the full sum of the mortgage debt, that fact would not affect the jurisdiction of the court or the validity of its decree when collaterally attacked. The jurisdiction of the court to pronounce a decree in the case is not contested, and if it rendered a decree for more than was due it was error merely, which might have been corrected on appeal by the proper party in apt time. But if it be conceded that it was an error, it was one of which the trustee could not complain; and there being no fraud on the part of the trustee the bondholders are as much bound as the trustee, and cannot avoid the decree in any form of proceedings. *Shaw* v. *Railroad Co. supra.*

It is needless to discuss in detail the charges of fraud contained in the bill. The plaintiff has lost all right to be heard by its own gross laches. In excuse for the long delay, the bill alleges the plaintiff was ignorant of the facts until recently. This allegation is not true. The plaintiff's agent had notice of all the facts, and testifies he communicated them to the plaintiff immediately after the sale. But the bill itself does not state a case that will excuse the delay. "A general allegation of ignorance at one time and knowledge at another is of no effect. If the plaintiff made any particular discovery it should be stated when it was made, what it was, how it was made, and why it was not made sooner. * * * There must be reasonable diligence, and the means of knowledge are the same, then, in effect as knowledge itself." *Wood* v. *Carpenter*, 101 U. S. 135, 140; *Harwood* v. *Railroad Co.* 17 Wall. 78; *Badger* v. *Badger*, 2 Wall. 87.

In *Harwood* v. *Railroad Co. supra*, there was a delay of five years, and in *Twin-lick Oil Co.* v. *Marbury*, 91 U. S. 587, there was a delay of four years, and the court denied relief in both cases on the ground of laches. In the case last cited, the defendant, at the time he purchased the corporate property, was a stockholder and director in the company, and the bill, which sought to charge him as a trustee, was filed by the company, and not, as in the case at bar, by a bondholder. All parties in this case were authorized to bid at the sale, and the fact that Johnson was president of the railroad company and the plaintiff a holder of bonds of the company did not in itself raise a trust relation between them which would entitle the latter to charge

the former as a trustee, and at its election treat his purchase as though made in trust for its benefit. It could only avail itself of Johnson's purchase by virtue of some agreement or fraudulent act on his part. The plaintiff does not rely upon any agreement, and if the conduct of Johnson was such as to entitle the plaintiff to avoid his purchase or avail itself of his bid, it ought to have exercised the right within a reasonable period. It could not delay the assertion of this right to enable it to decide, in the light of subsequent events, whether it would or not be profited by its assertion.

In *Twin-lick Oil Co.* v. *Marbury, supra,* Mr. Justice MILLER says: "No delay for the purpose of enabling the defrauded party to speculate upon the chances which the future may give him of deciding profitably to himself whether he will abide by his bargain or rescind it, is allowed it in a court of equity." That is precisely what the plaintiff asks the court to permit it to do in this case. It declined to take the property at the price bid by Johnson, because, as matters then appeared, that seemed to be all or more than the property was worth. It was patent to all at the time of the sale that the alternative would be presented to the purchaser of expending at once a large sum for repairs and improvements on the road, or abandoning its use as a railroad altogether. And after these expenditures had been made it was exceedingly doubtful whether the earnings of the road would equal its running expenses. In view of these facts, and the further fact that it was claimed then that the lien for the $1,350,000 state aid bonds issued to the road was paramount to the lien of the mortgage under which the road was sold, (which is still an open question so far as relates to this road,) it is not surprising that it was difficult to find a bidder for the property at the minimum price fixed in the decree, or that the plaintiff declined to take it at that price. Years afterwards, and when the property had greatly increased in value from causes not then foreseen, and from extensive repairs and improvements put upon it, and after other interests had intervened, and the plaintiff erroneously supposed the question of the lien for the amount of the state aid bonds was out of the way, it files this bill, and asks that it be permitted to do now what it declined to do then, take the property at Johnson's bid, and that he be decreed to be a trustee and required to account.

A more inequitable demand, considering the facts of the case, was probably never addressed to a court of equity. If it was settled that there was no lien on the road to secure the state aid bonds, the case would not be any more favorable for the plaintiff. Having declined

to take the risk of purchasing the property when it was doubtful whether the investment would entail a loss or yield a profit, it should not be permitted at this late day and in the light of subsequent events to reconsider that resolution. The profits, if in the end there are any, justly belong to the purchaser, who took the risk, and whose labor and capital have added largely to the value of the property. As was said by the court in *Wood* v. *Carpenter, supra,* it is impossible "to avoid the conviction that the plaintiff's conduct marks the difference between forethought in one condition of things and afterthought in another."

Laches need not be pleaded. If the objection is apparent on the bill itself, it may be taken by demurrer. *Maxwell* v. *Kennedy,* 8 How. 222; *Lansdale* v. *Smith,* 16 Cent. Law J. 28; [S. C. 1 Sup. Ct. Rep. 350.] And if the cause, as it appears on the hearing, is liable to the objection, the court will refuse relief, without inquiring whether there is a demurrer, plea, or answer setting it up. *Sullivan* v. *Portland R. Co.* 94 U. S. 811; *Badger* v. *Badger,* 2 Wall. 95.

The plaintiff and all other purchasers of the first-mortgage bonds have undoubtedly lost the money invested in them. But they did not lose it by the foreclosure proceedings. It was lost from the instant it was invested in bonds secured by a mortgage on a road which had an existence only in name. If they have any just ground of complaint, it would seem to be against those whose representations induced them to purchase the bonds, and who probably used the proceeds for purposes other than building the road.

Let a decree be entered dismissing the bill for want of equity, at plaintiff's costs.