FARMERS' LOAN & TRUST CO. v. WINONA & S. W. RY. CO. et al.

(Circuit Court, D. Minnesota, Third Division. November 20, 1893.)

1. RAILROAD COMPANIES—MORTGAGES—FORECLOSURE—DEFAULT.

A railroad mortgage recited that it was given to secure the due and punctual payment of the principal and interest of bonds, both bonds and interest coupons being payable unconditionally at maturity. Article 1 provided that, until default should be made in the payment of interest for six months after written demand of payment by the trustee, the mortgagor should remain in possession and control of the property, but that after such default the trustee might take possession. Article 2 provided that after such default the trustee, after entry or without entry, might sell the mortgaged property, and that this provision "is cumulative to the ordinary remedy by foreclosure in the courts." *Held*, that the first article was a limitation only on the trustee's right to take possession, and not on his general right to file a bill for foreclosure; and hence such bill would lie immediately upon default in payment of interest, without the necessity of giving notice, and waiting six months.

2. SAME—RECEIVERS.

In a suit for the foreclosure of a railroad mortgage and the appointment of a receiver, the allegations of bill and answer were in conflict as to the solvency of the railroad company, the condition and care of its property, and the wisdom and economy of its methods of operation, but it appeared that a majority of its stock was in the hands of a construction company, which had substantially the same officers, and whose interests were adverse to those of the mortgage bondholders, and that the company was unable or unwilling to pay the interest upon its bonds. *Held*, that a receiver should be appointed.

In Equity. Bill filed by the Farmers' Loan & Trust Company against the Winona & Southwestern Railway Company and the Winona & Southwestern Improvement Company.

Lawrence, Truesdale & Corriston, for complainant.
C. W. Bunn, for defendants.

CALDWELL, Circuit Judge. On the 2d day of April, 1888, the Winona & Southwestern Railway Company executed a mortgage on its railroad and property, thereafter to be constructed and acquired, to the plaintiff, as trustee, to secure an issue of first mortgage bonds to the amount of $18,500 per mile for each mile of the railway completed. The mortgage contemplated the construction of the road from Winona to a point of connection with the Union Pacific Railway Company at Council Bluffs, Iowa, and the ultimate issue of bonds to the amount of $6,950,000. The

bonds were to be issued in installments, as sections of five or more miles of railway were completed. The railway company entered into a contract with the Winona & Southwestern Improvement Company, by which the improvement company agreed "to build and fully construct and complete and equip" for the railway company its road, from Winona to Council Bluffs, prior to December 1, 1892, for which it was to receive the bonds and stock of the railway company as specified in the contract. Under this contract the improvement company, during the years 1889, 1890, and 1891, constructed the road from Winona to Osage, Iowa, a distance of 117 miles. The road has never been constructed beyond Osage; and on the 30th of June, 1893, the construction contract was, by mutual agreement between the railway company and the improvement company, canceled. To pay for the construction and equipment of the road from Winona to Osage, bonds were issued, from time to time, in the aggregate amount of $1,000,937. The principal of the bonds is payable in 1928, and they draw interest at the rate of 6 per cent., payable semiannually on the 1st days of April and October of each year, for which interest coupons are attached. The railway company made default in the payment of the interest coupons, amounting, in the aggregate, to the sum of $58,110, which fell due the 1st day of October, 1893, and the trustee has filed this bill to foreclose the mortgage for this overdue interest, and prays for the appointment of a receiver. The railway company challenges the right of the complainant to file a bill at this time to foreclose the mortgage for the overdue interest coupons. The mortgage provides that it is given "in order to secure the due and punctual payment of the principal and interest of the bonds." The bonds and the interest coupons are payable absolutely and unconditionally on the date of their maturity. Article 1 of the mortgage provides:

"Until default shall be made by the said party of the first part in the payment of principal or interest, or some part of either principal or interest, for six. months after demand of such payment in writing by the trustee, the railway company shall be suffered and permitted to possess, manage, operate, use, and enjoy the said property and the said railroad and its equipment, franchises, and appurtenances, and to take and use the rents, incomes, profits, and tolls thereof, as if this indenture had not been made; but, in case default shall be made in the payment of any interest, or any of the aforesaid bonds issued under, and secured by, this instrument, according to the tenor thereof, or. of the interest warrants or coupons thereto attached, and if such default shall continue for the period of six months after such demand in writing, it shall be lawful * * *" for the trustee to take possession of the mortgaged property.

Article 2 provides that, when default shall be made as provided in article 1, the trustee after entry, or without entry, may sell the mortgaged property; and it is declared in this article that:

"The above provision is cumulative to the ordinary remedy by foreclosure in the courts; and the trustee herein may at its discretion, and upon the written request of the majority in value of the bonds then unpaid shall, (upon being properly indemnified,) institute proceedings to foreclose in such manner (by sale under the said power or by suit) as the said majority of bondholders may direct. * * *"

The contention of the railway company is that the first clause of article 1 operates as a limitation on the right of the holders of the overdue coupons, or the trustee acting for them, to enforce payment of such coupons by a bill in equity to foreclose the mortgage, and that such a bill will not lie until the interest coupons are six months overdue, and the trustee has demanded their payment in writing. This contention is untenable. The provision of the mortgage quoted is a limitation on the power of the trustee to oust the railway company from the possession of the mortgaged property under the powers granted to the trustee by the mortgage deed. The terms upon which the trustee can enter and take possession of the property are prescribed by this article. But the clause in question does not purport to suspend or postpone payment of the interest coupons for six months after their maturity, or to deny to the holders thereof, or to their trustee, the right to pursue the usual and appropriate remedy in the courts for their collection at any time after their maturity. One or any number of bondholders may prosecute a bill to foreclose the mortgage upon default as to payment of a single coupon, or the trustee may intervene on behalf of all for the same purpose. And to this effect are the controlling authorities in this court. Guaranty Trust & Safe-Deposit Co. v. Green Cove Springs & M. R. Co., 139 U. S. 137, 11 Sup. Ct. 512; Alexander v. Railroad Co., 3 Dill. 487, Fed. Cas. No. 166; Credit Co. v. Arkansas Cent. R. Co., 15 Fed. 46; Dow v. Railroad Co., 20 Fed. 260. And, when such a bill is filed, the equity powers and jurisdiction of the court are precisely what they are in any other suit for the foreclosure of a mortgage after the maturity of the mortgage debt, or some part thereof. In such a suit the court may appoint a receiver for the same reasons that would influence it to make such an appointment in any other case of foreclosure. Such a foreclosure may be defeated by the mortgagor paying the overdue interest at any time before other defaults occur, and are set up in the bill, as they may be, for the decree may require the payment of all interest coupons then due, though some of them matured since the institution of the suit, and of the principal sum also, if, by the terms of the mortgage, it has become due. Undoubtedly, then, the bill is well brought to foreclose the mortgage for the overdue interest coupons. It has come to be common practice to appoint a receiver in suits for the foreclosure of mortgages on railroads for a default in the payment of any part of the mortgage debt. The negotiable bonds and coupons of a railroad company are placed on the footing of commercial paper, and, if such obligations are not promptly met at maturity, the company and its securities are at once discredited in the commercial world. When a company defaults in the payment of its interest coupons, it shares the common fate of all debtors who are unable or unwilling to meet their commercial obligations either by payment or by procuring an extension of time for payment. But the appointment of a receiver of the property of a railroad company is not necessarily one of the consequences of its failure to pay its interest coupons at maturity. The

right to a foreclosure does not necessarily carry with it the right to appoint a receiver. If the security is adequate, and there is no danger of ultimate loss to the mortgagee, the mortgagor's possession should not be disturbed until the final decree and the sale. The appointment of a receiver is not a matter of right, but rests in the sound discretion of the court, and is a power to be exercised sparingly and with great caution. Farmers' Loan & Trust Co. v. Kansas City, W. & N. W. R. Co., 53 Fed. 182.

As additional grounds for the appointment of a receiver, the bill alleges that the mortgaged property is very inadequate security for the mortgage debt; that the railway company is insolvent, and is not keeping the road and rolling stock in proper repair; that it has a large floating debt; and that the Winona & Southwestern Improvement Company owns a majority of the stock of the railway company; and that the officers of the two corporations are substantially the same persons; and that the railway is operated, and the affairs of the railway company are being managed and conducted, in the interest of the improvement company, and to the detriment and prejudice of those who hold the bonds of the railway company. It is alleged that 100 box cars, 34 flat cars, 2 caboose cars, and 3 engines which were placed on the road in October, 1891, as a part of its equipment under the construction contract between the railway company and the improvement company, and which were returned under oath, by the officers of the railway company, in 1892, to the auditor of state as the property of the railway company, were, when it became evident that the railway company would make default in payment of the interest coupons falling due October 1st, turned over to the improvement company, and leased by the railway company at an exorbitant rental. The defendants have filed their answer, in which they deny that the railway company is not keeping its road and rolling stock in good repair; deny that the railway has been operated for the use and benefit of the improvement company, or persons interested in that company; deny that the railway company has any floating indebtedness whatever, other than the sum of $181,073.66, owing to the improvement company, and for which that company holds the note of the railway company due on demand; and it is averred in the answer that "there is no intention on the part of the improvement company to demand payment presently, or to sue for the same, and the intention of both these defendants is, and always has been, that said indebtedness is, and always shall be, considered subordinate to the lien of the mortgage, both for principal and interest." The railway company admits that it is temporarily unable to pay its coupons which matured October 1st last, but avers that it "fully expects, within a short time, to be able to pay these coupons in default, and thereafter to keep said coupons paid promptly as they fall due," and "denies its insolvency or inability to meet any of its debts and obligations except in the sense that it is at present unable to pay said October 1st coupons or said note to the improvement company." Touching the cars and locomotives placed on the road in 1891, and recently turned over to the improvement company,

and 'hen leased to the railway company, the defendants say that this rolling stock was purchased and placed on the road at the time when it was expected the road would be constructed for some distance beyond Osage, and was intended to equip the road for such additional distance, and was in excess of the equipment required for that portion of the road actually completed under the construction contract; and that it has, for that reason, always been regarded as the property of the improvement company; and that the rental agreed to be paid therefor by the railway company to the improvement company is reasonable.

This is but a brief summary of the allegations of the bill and answer. Both parties have filed numerous supporting affidavits. Upon a preliminary hearing such as this, the court ought not to express an opinion upon material and disputed issues of fact— such, for instance, as the ownership of the cars in question. There is one fact that has an important bearing on the application for a receiver. It is admitted that the improvement company owns a majority of the stock of the railway company, and, as such stockholder, has it in its power to control absolutely the affairs of the railway company, and that the officers of the two companies are substantially the same persons, so that, in the matter of the ownership of the cars and engines mentioned and the rental therefor, as well as in all other matters in which the rights and interests of the railway company or its mortgage bondholders may be adverse to the interests of the improvement company, the railway company is completely at the mercy of the improvement company. It cannot protect itself from any exaction or demand the improvement company has a mind to prefer against it. The honesty of the improvement company and the integrity of its officers is not questioned; but there is high authority for saying that no man can serve two masters, and it is a maxim of the law that no man shall sit as a judge in his own case; and the acts of a trustee, where his private interests conflict with his duty as trustee, when not void, are subjected to the closest scrutiny, and the burden rests upon the trustee to show that his acts were honest, and in no wise prejudicial to his trust. The officers of the company cannot claim immunity from the operation of these rules; and the real question in the case is not whether the property shall be left in the possession of the railway company, but whether it shall be left under the control of the improvement company, whose interests may be quite inimical to those of the railway company or its mortgage bondholders, between whom and the mortgage bondholders an issue involving large amount of property is now actually joined. It is averred in the answer that the railway company fully expects, within a short time, to pay the interest coupons in default. Upon what this expectation is based does not very clearly appear. The answer avers the company has $23,000 in its treasury,—nearly half the sum required to pay the interest,—and it has been stated at the bar that the owners of this property are wealthy and in good credit. It would seem that, under such conditions, a solvent railway company should be

able to give some better and more binding assurance of its solvency, and its ability and intention to pay the interest, than is found in its answer.