STATE NAT. BANK OF DENISON v. SYNDICATE CO. OF EUREKA SPRINGS, ARK., et al.

(Circuit Court, W. D. Arkansas, Harrison Division. March 22, 1910.)

1. BANKRUPTCY (§ 9*)—BANKRUPTCY ACT—SUPERSEDING STATE LAW.

Bankruptcy Act July 1, 1898, c. 541, 30 Stat. 544 (U. S. Comp. St. 1901, p. 3418), does not supersede a state insolvency law as to an insolvent corporation not within the bankruptcy act.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 7-9; Dec. Dig. § 9.*

Effect of national bankruptcy act on state insolvency laws and on assignments for benefit of creditors, see note to Carling v. Seymour Lumber Co., 51 C. C. A. 11.]

2. PLEDGES (§ 53*)—REMEDIES OF PLEDGEE—ELECTION.

A pledgee, on maturity of the debt secured, may, at his election, sell the securities pledged after notice to the pledgor, or he may foreclose the pledgor's right to redeem in equity.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. § 129; Dec. Dig. § 53.*]

3. PLEDGES (§ 53*)—PLEDGEE—ENFORCEMENT OF COLLATERAL.

Where bonds are pledged as security for a debt, the pledgee on the maturity of the debt is not bound to enforce payment of the debt out of the collateral, but has his election either to enforce the collateral when it matures, or proceed personally against the pledgor.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. § 129; Dec. Dig. § 53.*]

4. PLEDGES (§ 30*)—PLEDGED COLLATERALS—PROTECTION—DUTY OF PLEDGEE.

Where corporate bonds were pledged to secure a debt, it was the duty of the pledgee, in the event that there was either waste or misappropriation of the properties covered by the deed of trust securing the bonds, to use reasonable diligence to secure the fruits thereof and to preserve and care for their payment.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. §§ 75-85; Dec. Dig. § 30.*]

5. COURTS (§ 344*)—FEDERAL COURTS—PROCEDURE—PROCESS.

Where a bill filed in the federal court to wind up the affairs of a corporation and distribute its assets also seeks the removal of an acting trustee under a deed of trust to secure bonds, and, in the event of the corporation's insolvency, the appointment of a receiver, and the cancellation of alleged fraudulent bonds held by nonresidents of the district, such

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

nonresidents may be brought in by constructive service as provided by the eighth section of the act of March 3, 1875 (18 Stat. 473, c 138).

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 917; Dec. Dig. § 344.*]

6. COURTS (§ 492*)—JURISDICTION—FEDERAL AND STATE COURTS.

Where a bill was filed by the pledgee of corporate bonds in the federal court to close the affairs of a corporation, remove an acting trustee for bondholders, and secure the appointment of another, and, in the event of the corporation's insolvency, for the appointment of a receiver, and to cancel alleged fraudulent bonds, the federal court acquired jurisdiction of the entire subject-matter, with the right to determine and administer the trust, regardless of any provisions of the trust deed, and hence such court was not bound to recognize any subsequent order in proceedings afterwards brought in the state court for the appointment of a new trustee in accordance with the deed of trust.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1345; Dec. Dig. § 492.*]

7. CORPORATIONS (§ 506*)—BONDS—PROCEEDINGS BY PLEDGEE—PARTIES.

In a suit by the pledgee of corporate bonds to protect the security from waste, for the appointment of a new trustee, the termination of the corporation's business, and the appointment of a receiver, the pledgor, having an equity of redemption in the bonds, was a proper party.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1971–2000; Dec. Dig. § 506.*]

Suit by the State National Bank of Denison against the Syndicate Company of Eureka Springs, Arkansas, and others. Demurrer sustained on the ground of defect of parties, and overruled on the other grounds.

John T. Suggs, for complainant.
Charles D. James, for defendants.

ROGERS, District Judge. At the argument it was contended that this court was without jurisdiction to wind up the affairs of the defendant, the Syndicate Company of Eureka Springs, Ark. (hereafter, for convenience, called the "Syndicate Company"), because the bankrupt law (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]) has superseded the state insolvency laws. Parmenter Mfg. Co. v. Hamilton, 1 Am. Bankr. R. 39, 172 Mass. 178, 51 N. E. 529, 70 Am. St. Rep. 258; Hickman v. Parlin-Orendorff Co., 88 Ark. 519, 115 S. W. 371; section 2, Am. Bankr. Law, approved July 1, 1898.

There is a conclusive answer to this contention. Section 4, Am. Bankr. Law 1898, is as follows:

"Sec. 4. Who may become bankrupts.—(a) Any person who owes debts, except a corporation, shall be entitled to the benefits of this act as a voluntary bankrupt. (b) Any natural person, except a wage earner or a person engaged chiefly in farming or the tillage of the soil, any unincorporated company, and any corporation engaged principally in manufacturing, trading, printing, publishing, or mercantile pursuits, owing debts to the amount of one thousand dollars or over, may be adjudged an involuntary bankrupt upon default or an impartial trial, and shall be subject to the provisions and entitled to the benefits of this act. Private bankers, but not national banks or banks incorporated under state or territorial laws, may be adjudged involuntary bankrupts."

It does not appear that the Syndicate Company falls within these provisions of the bankrupt law. If not, then the state insolvency laws are in force, and the general jurisdiction of courts of equity is not affected thereby, so far as the Syndicate Company is concerned.

Again, the status of the complainant as to being in a position to maintain the bill was assailed on two grounds: First, that complainant holds the bonds of the Syndicate Company as collateral only; second, that complainant must exhaust its remedies against its debtors, before it can subject its collateral to the payment of its debts.

Neither contention is sound. The complainant held the bonds of the Syndicate Company as pledgee to secure the payment of certain notes executed by the water company, payable to the order of W. M. Duncan, and by the latter assigned before maturity to complainant. In short, Duncan pledged the bonds to the complainant to secure the notes referred to. Now, what right did complainant acquire by this transaction? In Mitchell et al. v. Roberts, as Assignee (C. C.) 17 Fed. 778, Judge Caldwell said:

"A pledge is a bailment of personal property as a security for some debt or engagement. It is completed by a delivery of the property: it does not transfer the title; it only gives the pledgee a lien upon the property for his debt, and the right to retain the possession until his debt is paid. But the nonpayment of the debt, even after it is due, does not work a forfeiture of the pledge; the title remains in the pledgor until it is divested either by a foreclosure in equity or by a sale on due notice. Story, Bail. §§ 287, 286, 308-310; Edw. Bail. §§ 245, 279.

"Where the pledge is a chose in action, the term 'collateral security' is now most commonly applied to the transaction, and is the term used by the parties in this case; but this change of name has worked no change in the law." See, also, 22 A. & E. Enc. Law, 844, 893.

The complainant, therefore, had two remedies, either of which he could have pursued on the maturity of the notes of the water company. He could, after due notice to Duncan have sold the bonds, or he could have gone into a court of equity and foreclosed Duncan's right to redeem. True, the purpose of this bill, as it now stands, is not to foreclose Duncan's right to redeem; but the complainant as pledgee acquired other rights than those just referred to. In 22 A. & E. Enc. L. 897, the author, under the heading of "Concurrent Remedies of Pledgee," lays down the general principle as follows:

"It is well settled that, where a chose in action or evidence of debt is assigned as collateral security, the pledgee, when the debt secured falls due, is not obliged to enforce the payment of the debt out of the collateral, but he has his election either to enforce the collateral when it matures or to proceed personally against the pledgor."

This principle is sustained by many authorities there cited in footnote 5, both state and federal, including Arkansas.

On page 899 of the same volume, the author, under the title "Duty of Pledgee to Pursue and Preserve Collaterals," lays down the general principle in this language:

"It is well settled that when a chose in action, such as a bond, note, or accepted order on a third person, is transferred and delivered to a creditor as collateral security, it is the duty of the pledgee to use reasonable care and diligence to make such collateral available; that he is bound to use proper exertions to render the collateral effectual for the purpose for which it was

pledged; that if necessary he must bring an action against the maker of the collateral; and that if, through his negligence or wrongful act or omission, the collateral is lost, he is accountable and liable to the pledgor in the same manner as a pledgee of goods and merchandize is liable to the pledgor if they are lost or destroyed, through the pledgee's failure to give them the necessary protection and care."

And on page 901 of the same volume, the author, under the title of "Duty of Pledgee to Foreclose Mortgage," and the title "Where a Negotiable Instrument is Pledged," states the following principles:

"Where a mortgage is assigned by the holder thereof as collateral security, it is the duty of the pledgee to foreclose such mortgage when he has a right to do so, and if through his fault the same is not foreclosed, and the pledgor suffers loss, the pledgee will be held responsible."

"The pledgee stands in the shoes of the pledgor, and it is his duty to take such steps as are necessary under the law governing commercial paper to preserve the liability of all the parties to the instrument."

And on page 902 of the same volume, under the title "What Degree of Diligence Required of Pledgee in Collecting Collaterals," the author lays down the general principle as follows:

"The rule is that the pledgee must exercise ordinary and reasonable diligence to secure the fruits of the collateral, but he is held to no greater degree of diligence, and extraordinary care and efforts in the collection of the collaterals are not necessary."

I have said enough to show that it is the duty of the complainant in this case in the event there is either waste or misappropriation of the properties covered by the deed of trust, to use ordinary and reasonable diligence to secure the fruits of the collateral, and to preserve and care for its payment. I need not pursue this subject further.

But this bill has other objects than the winding up of its affairs and the distribution of its assets. It seeks the removal of the acting trustee and the appointment of another, and in the event of insolvency the appointment of a receiver, and also to cancel the alleged fraudulent bonds held by the Pennsylvania defendants. No service has been had upon the Pennsylvania defendants; but it is quite certain they may be brought into court constructively under section 8 of the act of March 3, 1875 (18 Stat. p. 473, c. 138)—Woods v. Woodson, 100 Fed. 515, 40 C. C. A. 525; Mellen v. Moline Iron Works, 131 U. S. 352, 9 Sup. Ct. 781, 33 L. Ed. 178; Jellenik v. Huron Copper Mining Co., 177 U. S. 1, 20 Sup. Ct. 559, 44 L. Ed. 647—and the validity of the bonds held by them inquired into, upon the assumption, of course, that the Syndicate Company is insolvent as alleged and conceded by the demurrer. And this brings us to the most important, as well as the most delicate, question involved, i. e., whether this court can, on the allegations of the bill and the concessions of the demurrer, remove the Central Bank of Eureka Springs as trustee, and appoint another in its stead; or, to put it in another form, had the state chancery court the power or jurisdiction, when it appointed the Central Bank of Eureka Springs trustee, to make such appointment? The federal courts, and properly so, scrupulously respect the acts of the state courts had within the scope of their jurisdiction and powers; but they insist, and properly so, in maintaining their own jurisdiction, when once attached, from all interference by state courts.

An examination of the original bill in this case discloses the fact that it was filed July 19, 1909, process issued, and shortly thereafter a motion set down for hearing for the appointment of a receiver of the assets of the Syndicate Company, on the ground of insolvency, and also for an accounting and foreclosure, sale, and distribution of its assets. These matters, more fully amplified, appear in the amended bill of complaint. It is also shown, in both the original and amended bills, that, at the time the former was filed, the Citizens' Bank of Eureka Springs had ceased to be the trustee of the Syndicate Company, and the trusteeship was vacant, and that no steps had been taken to fill said trusteeship in the state chancery court in which the case belonged.

Waiving all questions relating to the regularity of the proceedings of the said chancery court as to the incorrectness of the name of the Central Bank of Eureka Springs, Ark., and its capacity to act as trustee for the Syndicate Company, the question arises on the facts stated as to the power of the state chancery court after this court had acquired jurisdiction of the subject-matter to make any order in the premises by which this court must be bound. Of the plenary jurisdiction of courts of equity over the whole subject of trusts, and regardless of any provision in the deed of trust to remove a trustee for cause, or to fill a vacancy in the trusteeship, no argument or citations of authority need be indulged. 22 Enc. P. & P. p. 9 et seq.

In the case of William D. Waters, Plaintiff, v. Edwin Shinn, Defendant (heard in this court in 1907) 178 Fed. 345, the question now involved was presented, carefully considered, and determined. I quote:

"In Adams v. Mercantile Trust Co., 66 Fed. 617 [15 C. C. A. 1], the case was substantially this: In 1893 one Broughton filed a bill in a state court in Florida against the Jacksonville, Mayport & Pablo Railway & Navigation Company, to which the Mercantile Trust Company, trustee of a mortgage upon the railroad, was made a party, in which he claimed a first lien upon the property of the railway company, alleging its insolvency, and the existence of numerous other liens on its property, and sought the appointment of a receiver and the sale of the road for the payment of the liens. On November 17, 1893, a decree pro confesso was taken against the trust company, and on March 6, 1894, after hearing on the answer of the railway company, the state court made a decree granting the prayer of the bill, and sending the case to a master to take account of the indebtedness. Subsequently, on March 19, 1894, the said Mercantile Trust Company filed its bill in the federal court for a foreclosure of its mortgage on the same railway property, and on the same day, on consent of the railway company, a receiver of its property was appointed by the federal court, which took actual possession of the road. April 5th following, the state court appointed a receiver of the railroad in the suit originally brought by Broughton. On the 21st of May the receiver appointed by the state court filed his intervening petition in the federal court, seeking delivery to him as receiver in Broughton's suit of the property then in the hands of the receiver of the federal court. The question, therefore, was clearly brought before the federal court as to whether its receiver should surrender the property to the state court, or retain it and administer it itself. By the unanimous opinion of the Circuit Court of Appeals of the Fifth Circuit, it was held that the property should be surrendered to the state court, although the federal court had first acquired actual possession of it. Judge Pardee used this language:

" 'The suit instituted by Broughton in the state court against the Jacksonville, Mayport & Pablo Railway & Navigation Company brought under the direct control of the court all the property of said railway company to be administered for all entitled to share the fruits of the litigation. The possession and control of the railroad were absolutely necessary to the exercise of

the *jurisdiction of the court.* The filing of the bill, and the service of process thereunder, was an equitable levy upon the property. Miller v. Sherry, 2 Wall. 237 [17 L. Ed. 827]; Railroad Company v. Pettus, 113 U. S. 116–124, 5 Sup. Ct. 387 [28 L. Ed. 915]. Pending the proceedings in that court under the said bill, the said railroad and property may be said to be in gremio legis. Union Trust Company v. Rockford, R. I. & St. L. R. Co., 6 Biss. 197, Fed. Cas. No. 14,401; Railroad Company v. Gomila, 132 U. S. 478, 10 Sup. Ct. 155 [33 L. Ed. 400]. The *Mercantile Trust Company was made a* party to the suit, and, so far as the record goes, is bound by the proceedings had therein.'

"Prior to that decision Mr. Justice Bradley, in the case of Wilmer v. Railway Company, 2 Woods, 409–427, Fed. Cas. No. 17,775, had held to a contrary doctrine. The Court of Appeals of the Fifth Circuit declined to follow the decision of Mr. Justice Bradley, and distinctly approved the decision of Mr. Justice Woods, whose opinion is supported by a large number of authorities, state and federal, cited in the opinion to which I have referred. In conclusion Judge Pardee said:

" 'The views expressed by Judge Woods have been accepted and followed, in this *circuit at least, and we fully concur* therein, as a correct exposition of the law, and one particularly applicable to the present case; while the decision of Mr. Justice Bradley, doubted by himself, is open to the objection that thereby jurisdiction is frequently made to depend upon a race between marshals and sheriffs, likely to result in unseemly controversies between state and federal courts. Considering the present case, however, as one in which neither the appointment nor the ousting of a receiver of any court is involved, but as presenting a question of comity *between state and federal courts,* we are of opinion that the court below erred in not granting the application of the receiver of the state court for the possession of the property which is so clearly necessary for the further exercise of that court's jurisdiction, and to which possession we think it so clearly entitled. The decree appealed from is reversed, and the cause remanded to the court below, with direction to enter an order and decree in favor of the intervener, restoring to his possession, and to the possession of the state court, the property of the Jacksonville, Mayport & Pablo Railway and Navigation Company.'

"This case is important in this, that it distinctly holds that the filing of a suit in equity, the nature and character of which involved the direct control of the property in controversy, is an equitable levy upon the property, and that pending the proceeding in such court under the bill, as stated, the property may properly be said to be in gremio legis, or under the guidance of the law, and Mr. Justice Woods, in his opinion in the same court, said:

" 'The commencement of the action, the service of process, the, according to some of the cases, simple commencement of the suit by the filing of the bill, is sufficient to give the court jurisdiction to the exclusion of all other courts.'

"In the case of Appleton Water Works Company et al. v. Central Trust Company of New York, 93 Fed. 286 [35 C. C. A. 302] the same doctrine is approved. In this case the court says:

" 'I am of opinion that the true inquiry is one of actual cognizance by the court, and that the entry of an order upon the filing of the bill for any purpose involved in the action, and especially one tending to possession by the court of res, is sufficient for jurisdiction to attach without waiting an actual service of the parties, and that the orders entered on July 16, 1898, accomplished that purpose in this case, without regard to the effect of the attempted service of July 18th, which appears to have given actual notice of the proceedings and orders to the interested parties and probably induced the counter proceedings in the state court. * * * This bill as filed states a case for receivership as a necessary incident to the foreclosure, that the franchises and property are imperiled in the hands of the mortgagee, and that it is essential to the complainant's relief to preserve the rents and profits as well as the mortgaged property; and to that end there must be possession by the court of the res.' "

The cases from which I have just quoted foreclose the question, and make it clear that the state chancery court was without any authority

to make any order which would, in effect, withdraw from this court, or diminish its powers to control and administer the affairs of the Syndicate Company as equity, and the right of all the parties may require. The status of the parties and the equities of the case and the powers and duties of the court are, as a general rule, fixed when the bill is filed. At that time the Central Bank of Eureka Springs was not a trustee for the Syndicate Company. It became a trustee afterwards, and was brought into this case by the amended bill. Neither as trustee, or otherwise, whatever its interests may be, can the Central Bank, thus coming in, acquire any right which can affect the powers or jurisdiction of this court, or alter the status of the case as it stood when the bill was filed.

But it is contended that a holder of the bonds of the Syndicate Company as mere collateral to secure an independent debt does not give that status in law which would authorize such holder to come into court to protect the trust property, even though the trusteeship is vacant, and that the trusteeship must be filled in the manner provided by the parties in the deed of trust. This subject had the careful consideration of this court in the case of the Guardian Trust Company v. White Cliffs Portland Cement & C. Company (C. C.) 109 Fed. 527. The court there said:

"It was contended, in this regard, that the trustee was limited to the provisions of the deeds of trust with reference to any action he might take in the premises; but the contention cannot be maintained. In paragraph 749, Perry, Trusts, the author says:

" 'The corporation itself issues the bonds, and promises to pay the principal and interest at a time named. So long as the corporation pays the interest or the principal of the bonds as agreed, the trustees have little or nothing to do. The general principles of the law of trusts apply to them. Sturges v. Knapp, 31 Vt. 1. They hold the security in trust for the bondholders, as a cestuis que trustent; and they must act in good faith, and for the best interest of all. They must take care that the property is not wasted or depreciated or rendered worthless as security.'

"And this rule is believed to be universally recognized. Shorts, Ry. Bonds & Mortg. par. 284, and cases there cited. Phinizy v. Railroad Co. (C. C.) 56 Fed. 277. In the last-named case Judge Simonton lays down the broad principle that 'a trustee can always come into a court of equity for aid or instruction in conserving his trust.' The trust company therefore had the right, and it was its duty, when, in its opinion, the security covered by its mortgage was jeopardized, or the interest of the bondholders, for whom it was trustee, was endangered, to come into a court of equity, independent of the provisions of the mortgage, under the general principle of the law of trusts, for the purpose of conserving the property covered by the mortgage. It may be suggested in this connection that, when the lease held by the cement company was assailed in this court, it, to all intents and purposes, conceded its invalidity, by voluntarily submitting to a cancellation of the lease. But the right to maintain this suit does not depend, in the opinion of the court, upon the validity or invalidity of the lease, nor upon the want of power in the chalk company to make the same at the time it was executed. The jurisdiction is equally maintainable upon the ground that there had been a default in the payment of its interest at the time the bill was filed. By the second provision of the mortgage quoted supra, it is made to appear that the chalk company agreed 'to punctually pay the principal and interest of the bonds intended to be hereby secured, as the same shall become due and payable according to the terms in the said bonds and the coupons thereto attached contained, and on the day therein respectively mentioned for the payment of the same.' The failure to do this was a breach of the conditions of the mortgage.

"It is contended, however, that suit could not be brought until three months had expired, and until demand had been made by a majority of the bondholders upon the trustee to institute suit, as provided in the fourth covenant of the mortgage, supra. This contention cannot be sustained. A similar contention was raised in Railroad Co. v. Fosdick, 106 U. S. 67, 27 L. Ed. 54, and the court in that case said:

" 'It is undeniable that at the date of the filing of the bill, which was February 27, 1875, the defendant, the Chicago, Danville & Vincennes Railroad Company, was in default for nonpayment of the coupons on $698,500 of the issue of $2,500,000 of the Illinois division bonds, which matured October 1, 1873. The holders of that amount of these bonds did not fund their coupons, and none of them were paid. This failure on the part of the mortgagor constituted a breach of one of the conditions of the mortgage, and, continuing for six months, entitled the trustee, under the fifth article, to take possession of the mortgaged premises, on being so required by the holders of not less than one-half the outstanding bonds, and collect the net income, until the default should have been satisfied, or to sell the mortgaged premises under the power conferred by the sixth article of the conditions. In the latter event the mortgaged premises would be sold as an entirety, free from the incumbrance of the mortgage, and the proceeds of the sale applied first to the payment of the amount due and in arrears, and then to the mortgage debt not then due, and any surplus to the mortgagor. But, inasmuch as by the terms of the first article the conveyance is declared to be for the purpose of securing the payment of the interest as well as the principal of the bonds, and by the fourth article the mortgagor's right of possession terminates upon a default in the payment of interest as well as principal on any of the bonds, we are of opinion that, independently of the provisions of the other articles, the trustees, or, on their failure to do so, any bondholder, on nonpayment of any installment of interest on any bond, might file a bill for the enforcement of the security, by the foreclosure of the mortgage and sale of the mortgaged property. This right belongs to each bondholder separately, and its exercise is not dependent upon the co-operation or consent of any others or of the trustees. It is properly and strictly enforceable by and in the name of the latter, but, if necessary, may be prosecuted without and even against them. It follows from the nature of the security, and arises upon its face, unless restrained by its terms.'

"Under this decision, binding upon this court, and which, so far as I have been able to ascertain, has never been modified or overruled, the trustee, upon the default of the interest, had the right immediately without reference to the expiration of three months, or the demand of any bondholder, to invoke the aid of a court of equity for the purpose of foreclosing the overdue interest. Nor does this conclusion militate in the slightest degree against the provisions contained in the fourth covenant of the mortgage quoted supra, where the trustee, upon the demand in one case of 40 per cent. of the bondholders and in the other upon demand of 50 per cent. of the bondholders may take possession of the property and appropriate its rents and profits to the satisfaction of the mortgagee or may proceed to sell the same according to its terms. These are express remedies conferred by the terms of the mortgage, and similar provisions were upheld in the case of Railroad Co. v. Fosdick, supra. The same doctrine was upheld in Central Trust Co. v. Texas & St. L. Ry. Co. (C. C.) 23 Fed. 846; Farmers' Loan & Trust Co. v. Chicago & Alton R. Co. (C. C.) 27 Fed. 147–152. In the last-cited case Judge Gresham said:

" 'It does not follow, however, that because this power is given to the holder of a majority of the bonds that the trustee, at the request of a minority, or even of a single bondholder, may not commence proceedings to foreclose for the nonpayment of interest, or if, on proper demand, the trustee refuses to bring suit, that the minority, or even a single bondholder, may not sue. Failure to pay a single installment of interest is a breach of the trust deed.'

"In Mercantile Trust Co. v. Chicago, P. & St. L. R. Co. (C. C.) 61 Fed. 372, Circuit Judge Woods held:

" 'A railroad mortgage provided that until default the mortgagor should be permitted to remain in possession. It also provided that in case of default in the payment of interest, and such default should continue for six months,

it should be the duty of the trustee to take appropriate proceedings at law or in equity to enforce the rights of the holders of bonds upon a requisition of holders of at least one-third in the amount of the bonds. *Held*, that whatever right a bondholder has he has the right to have the trustee enforce for his benefit, and that therefore the trustee could file a bill to foreclose upon default in the payment of interest, although such default had not continued for six months.'

"In Farmers' Loan & Trust Co. v. Winona & S. W. R. Co. (C. C.) 59 Fed. 959, Caldwell, Circuit Judge, in construing a mortgage somewhat similar to this, held:

" 'The contention of the railway company is that the first clause of article 1 operates as a limitation on the rights of the holders of the overdue coupons, or the trustee acting for them, to enforce payment of such coupons by a bill in equity to foreclose the mortgage, and that such a bill will not lie until the interest coupons are six months overdue, and the trustee has demanded their payment in writing. This contention is untenable. The provision of the mortgage quoted is a limitation on the power of the trustee to oust the railway company from the possession of the mortgaged property under the powers granted to the trustee by the mortgage deed. The terms upon which the trustee can enter and take possession of the property are prescribed by this article; but the clause in question does not purport to suspend or postpone payment of the interest coupons for six months after their maturity, or to deny the holders thereof, or to their trustee, the right to pursue the usual and appropriate remedy in the courts for their collection at any time after their maturity. One or any number of bondholders may prosecute a bill to foreclose the mortgage upon default as to payment of a single coupon, or the trustee may intervene on behalf of all for the same purpose. And to this effect are the controlling authorities in this court. Guaranty Trust & Safe Deposit Co. v. Green Cove Springs & M. R. Co., 139 U. S. 137, 11 Sup. Ct. 512, 36 L. Ed. 116; Alexander v. Railroad Co., 3 Dill, 487, Fed. Cas. No. 166; Credit Co. of London v. Arkansas Central R. Co. (C. C.) 15 Fed. 46; Dow v. Railroad Co. (C. C.) 20 Fed. 260. And when such a bill is filed the equity powers and jurisdiction of the court are precisely what they are in any other suit for the foreclosure of a mortgage after the maturity of the mortgage debt, or some part thereof. In such a suit the court may appoint a receiver for the same reasons that would influence it to make such an appointment in any other case of foreclosure.'

"In Guaranty Trust & Safe Deposit Co. v. Green Cove Springs & M. R. Co., 139 U. S. 137, 11 Sup. Ct. 512, 35 L. Ed. 116, the Supreme Court of the United States, in discussing a similar question to this, said that a provision in a mortgage that the mode of sale provided by it shall be exclusive of all others is an attempt to provide against a remedy in the ordinary course of judicial proceedings, and oust the jurisdiction of the courts, and is therefore invalid. So that if, by the terms of this mortgage (which is not the fact), no other remedy had been left than that set forth in the mortgage, to the trustee and the bondholders, the provision would have been invalid. Parties will not be permitted to deprive courts of chancery of their general jurisdiction to grant relief in proper cases by stipulations between themselves. But an exhaustive and instructive decision is that of Toler v. Railroad Co. (C. C.) 67 Fed. 170, and see [Galveston, H. & H. R. Co. v. Cowdrey] 11 Wall. 459 [20 L. Ed. 199]."

It will be remembered that when this bill was filed the trusteeship was vacant and the interest on complainant's bonds long overdue. The payment of that interest defeated the appointment of a receiver, but the jurisdiction of the court did not depend solely upon the fact that there had been a default in the interest on complainant's bonds. The bill charges insolvency, the waste and mismanagement of the property and the funds collected belonging to the Syndicate Company, the vacancy of the trusteeship, the existence of the fraudulent outstanding bonds in the hands of the Pennsylvania defendants, to whom the deed of trust requires payment of interest, and which bonds the

bill seeks to have canceled, all of which are distinctly grounds of equity jurisdiction, and the truth of which was conceded by the demurrer.

The bill is also demurrable for want of proper parties; it being necessary that W. M. Duncan should be made a party defendant, because he has the equity of redemption in the bonds held by the complainant. The court has reached the conclusion that this ground of demurrer is well taken. If, as it has heretofore been made to appear, Duncan has the right to pay complainant's debt and have the collateral returned to him, he should have the opportunity to be heard before any steps affecting his equity of redemption shall be finally determined. Questions may arise in the event of the winding up of the affairs of the Syndicate Company, as to what the amount of the debt of the complainant is, and what he has a right to recover as attorney fees, and costs and other expenses involved in this litigation. Before any such sum should be paid out of Duncan's collateral, he should have an opportunity to be heard with reference thereto, and while it may be, under the rules laid down by the Court of Appeals, he is not an indispensable party, he is certainly a proper party, and, inasmuch as his being brought into court will not divest the court of its jurisdiction, the court is of opinion he should be made a party. See Rogers et al. v. Penobscot Mining Company et al., 154 Fed. 606, 83 C. C. A. 380, where the general principles governing parties are admirably stated by Judge Sanborn, speaking for the Court of Appeals.

The demurrer, therefore, will be overruled on all the grounds except that of defect of parties; it will be sustained as to that, and the complainant will be required to amend his bill and bring in William M. Duncan as a party defendant. The costs of this demurrer will be permitted to abide the final judgment of the court.