ATLANTIC TRUST CO. et al. v. DANA et al.

DANA et al. v. ATLANTIC TRUST CO. et al.

(Circuit Court of Appeals, Eighth Circuit. December 21, 1903.)

Nos. 1,896, 1,899.

1. CREDITORS' SUITS—EFFECT OF DISSOLUTION OF CORPORATION DEFENDANT—KANSAS STATUTE.

The equitable lien acquired by judgment creditors of a corporation by joining or intervening in a creditors' suit is not affected by the subsequent dissolution of the defendant corporation, nor by their failure to revive their judgments within a year thereafter, as provided for by the statute of Kansas (Gen. St. 1901, §§ 4883, 4889), in case of the death of either party after judgment and before satisfaction thereof; the only effect being to render the judgments dormant so far as the issuance of execution or the enforcement of a statutory judgment lien is concerned.

2. CORPORATIONS—DEBTS ENTITLED TO PRIORITY OVER MORTGAGE—JUDGMENTS FOR TORTS.

Judgments obtained against a corporation for personal injuries to third persons not in the employ of the corporation, resulting from the negligence of its employés, are not to be classed as liabilities for operating expenses, and are not entitled to priority of payment over the mortgage debts of the corporation from the earnings of a receivership initiated at suit of other creditors subsequent to the date of the injuries, or from the proceeds of the mortgaged property.

3. SAME—EQUITABLE LIENS—INTERVENTION IN CREDITORS' SUIT.

Intervening petitions filed by judgment creditors of a corporation in a pending creditors' suit, in which a receiver has been appointed, operate as equitable levies, and create equitable liens for the satisfaction of such judgments on the property and income of the corporation from the date of their filing, subject to prior liens and superior equities.

4. SAME—RIGHTS OF MORTGAGEE—IMPOUNDING INCOME BY INTERVENTION IN RECEIVERSHIP SUIT.

Where, at the time of the commencement of a suit to foreclose a mortgage given by a corporation, which covered all its property and its income as expressly authorized by statute, and authorized the mortgagee to take possession in case of default, the property was in the possession of a receiver previously appointed in a creditors' suit, the mortgagee properly asserted its right to possession of the property in the only effective way by obtaining leave to intervene in the receivership suit and setting up therein its rights under the mortgage and its pending suit, and such intervention gave it a prior right to the income earned by the receiver thereafter as against ordinary judgment creditors intervening subsequently, whose judgments were obtained during the receivership. It was not essential to such priority of its lien that a new receiver should have been appointed or the existing receivership formally extended to its suit prior to the intervention by the judgment creditors.

5. JUDGMENT—PERSONS CONCLUDED—REPRESENTATION BY RECEIVER.

Where a receiver for a corporation, required by the order appointing him to defend any suit seeking to establish a lien against the corporation's property, intervened in a foreclosure suit against the corporation brought in the same court, and litigated the claim of the complainant therein under his mortgage to a fund due the corporation, a decree awarding the fund to the mortgagee is binding not only on the receiver, but also on all parties to the suit in which he was appointed, including interveners therein, such parties being represented by him, and neither necessary nor proper parties to the foreclosure suit.

6. CORPORATIONS—MORTGAGE OF INCOME—VESTED RIGHTS OF MORTGAGEE.

A mortgage given by a corporation, which covers its property and also pledges its income, gives the mortgagee a lien on the corpus of the prop-

128 F.—14

erty, which may be enforced on a default, but as to the income the lien may be enforced only as to future income after it has been impounded by the mortgagee by the assertion of his right in appropriate proceedings; but a mortgage of the income, even before it has been made effective by such impounding, gives the mortgagee a vested right to so impound it, which cannot be displaced, postponed, or impaired in the interest or at the instance of an unsecured creditor, any more than can the mortgage lien upon the corpus of the property.

**7. SAME—PERMANENT IMPROVEMENTS BY RECEIVER.**

Where a receiver for the property of a corporation, appointed in a suit by judgment creditors, to which mortgagees are not parties, is directed by the court to make permanent improvements on the property, the cost of such improvements cannot be charged against income accruing after a mortgagee, to whom the income was pledged as security, has asserted his right thereto by an intervening petition filed in aid of a suit to foreclose his mortgage. The court, through the medium of a receivership, can no more displace or postpone the prior mortgage lien than could the mortgagor.

**8. SAME—TAXES.**

Taxes payable from the income of a receivership for a year, which for a part of the year belongs to one creditor and for the remainder to another, should be charged upon both funds in proportion to the time during which they were earned, respectively, without reference to the date when the taxes are payable.

Appeal from the Circuit Court of the United States for the District of Kansas.

Primarily, these appeals present a controversy between a second mortgagee and two judgment creditors over the income of mortgaged property, a waterworks plant in Topeka, Kan. The Topeka Water Supply Company, through an ordinance of the city of Topeka, obtained the privilege of constructing and maintaining a waterworks plant in that city, upon condition that it would supply the city and its inhabitants with water upon terms prescribed in the ordinance. By the terms of the ordinance the city rented from the water supply company 150 hydrants at an annual rental of $7,000, and that company agreed to erect and maintain, when directed by the city, additional hydrants for a stated additional rental. The ordinance contained this stipulation: "Sec. 8. Should the said Topeka Water Supply Company, in the construction of its works, deem it expedient to issue the first mortgage bonds of said company, and said bonds to bear interest at a rate not exceeding seven per cent. per annum, then the said Topeka Water Supply Company agrees that the seven thousand dollars to become due from said city for the aforesaid hydrants' rental from year to year as aforesaid, shall be considered and set aside as net earnings of said Topeka Water Supply Company, and the same shall be paid over semi-annually as aforesaid by said city to the fiscal agent of the state of Kansas, in the city of New York, for the payment exclusively of the interest coupons of said bonds as the same may, from time to time, become due and payable, and to provide a sinking fund for the payment of said bonds. Deferred or delayed payments shall bear seven per cent. interest per annum from the time they become due."

January 2, 1882, the water supply company, for the purposes of raising money to pay for the labor and material then being expended in constructing its water plant, issued a series of first mortgage bonds, bearing interest at 6 per cent. per annum. Both principal and interest were made payable at the fiscal agency of the state of Kansas in the city of New York. To secure the payment of these bonds, the water supply company executed to William B. Strong, as trustee for the holders of the bonds, a mortgage upon all its property and franchises then possessed or to be acquired, including "all the privileges and franchises heretofore or hereafter acquired by the said first party under and by virtue of the several ordinances of the city of Topeka, and the contracts between the said city and said first party." The mortgage stipulated that upon the occurrence, and continuance for a time stated, of default

in the payment of interest, all the bonds could be declared at once due and payable, and the trustee could take possession of the mortgaged property and operate the same, and could institute proper judicial proceedings to foreclose the mortgage, but that until default the mortgagor would be permitted to possess, manage, and enjoy the mortgaged property.

In 1889 the Topeka Water Company, with the consent of the city of Topeka, purchased all the property, privileges, and franchises of the water supply company, and thereby became its successor. Both water companies were Kansas corporations.

February 1, 1890, to secure the payment of a series of bonds issued by it on that date, the Topeka Water Company executed to the Atlantic Trust Company, as trustee for the holders of such bonds, a mortgage upon all its property and franchises then possessed or to be acquired, specifically including "all the income, rents, profits, emoluments, and moneys derived from said waterworks, and including any revenues from any other sources whatever." This mortgage stipulated that until default the mortgagor would be permitted to possess, manage, operate, use, and enjoy the mortgaged property, and that, in the event of the occurrence, and continuance for a stated time of a default in the payment of interest all the bonds could be declared at once due and payable, and the trustee, upon demand, could take and maintain possession of the mortgaged property, and receive all tolls, income, and revenues thereof, and could institute proper judicial proceedings to foreclose the mortgage. It contained a further provision that: "Upon the filing of a bill of equity, or other commencement of judicial proceedings to enforce the rights of the trustee and of the bondholders under these presents, or to protect any of the property hereby conveyed from sale upon any execution or decree of any court within the state of Kansas for the payment of money, the said trustee shall be entitled to exercise the right of entry herein conveyed, or to the appointment by any court of competent jurisdiction of a receiver or receivers of the property hereby mortgaged, and of the earnings, income, revenue, rents, issues, and profits thereof, pending such proceedings with such powers as the court making such appointment shall confer."

February 10, 1894, John O'Halloran, who had recovered a judgment at law against the water company for $3,900 and costs, filed in the court below a judgment creditor's bill against the water company as sole defendant, and obtained the appointment of Elias Summerfield as receiver of the company's entire property and income. The order appointing Summerfield as receiver directed him "to defend any action * * * seeking to establish claims, liens, or demands against the said defendant, or its property," and to "prosecute any action necessary * * * for the collection of any sum due said defendant, or for the protection and preservation of said property." Summerfield qualified as receiver, took possession of the company's property, and operated its waterworks plant.

May 27, 1894, Strong filed in the court below an independent bill against both water companies, the Atlantic Trust Company, O'Halloran, and the city of Topeka to foreclose the mortgage given to him as trustee. In addition to otherwise stating a case for foreclosure, this bill made specific reference to the ordinance of the city granting the water supply company the privilege of constructing and maintaining the waterworks plant; set forth the contract contained in that ordinance respecting the renting of hydrants by the city and respecting the payment by the city of certain hydrants' rental to the fiscal agency of the state of Kansas in the city of New York for the exclusive benefit of the bondholders in the event of the issuance of first mortgage bonds of the company; set forth the issuance of such bonds as before stated, and alleged: "* * * Nor did the city of Topeka pay over semiannually said hydrants' rental to the fiscal agency of the state of Kansas in the city of New York for the payment exclusively of the interest coupons as the same might from time to time become due and payable, or to provide a sinking fund for the payment of said interest and bonds, as required by the ordinance and agreement therein contained between the Topeka Water Supply Company and the City of Topeka, which ordinance and agreement and rights and privileges therein contained are covered by the trust deed to your orator aforesaid. But to reserve the said net rental and to pay the same to the said

fiscal agency of the state of Kansas in the city of New York, as required by said ordinance and agreement therein contained, the said Topeka Water Supply Company, its successors and assigns, and said City of Topeka have neglected and failed." In addition to a prayer for foreclosure and for general relief, this bill asked that the mortgage be declared a first lien upon all the property of the water company and upon the "contracts described in said mortgage," "and that the said Topeka Water Supply Company, said Topeka Water Company, or some of the other defendants, and such of the defendants as may be liable therefor, may be decreed to pay unto your orator, in trust for the holders of said bonds and coupons, whatever may be found to be due." No receiver was appointed in this suit, nor was any effort made by Strong to impound the income of the mortgaged property for the benefit of his mortgage, through an intervention in the O'Halloran receivership suit.

In original and amended answers to this bill the city denied "that it at any time assumed or agreed to pay the interest on the bonded debt, or the principal of the bonded debt, of the Topeka Water Supply Company, or of the Topeka Water Company," and alleged that it was never notified of the mortgage to Strong, trustee; that it was never requested to pay any hydrants' rental to the fiscal agency of the state of Kansas in the city of New York for the purpose of paying the interest or principal of said bonds, and that it had from the beginning paid said rental to the original and succeeding water companies, with the consent of Strong, as trustee.

December 9, 1896, Summerfield, the receiver appointed in the O'Halloran suit, intervened in the Strong foreclosure suit, alleging that the city of Topeka was then indebted to the water company for specified hydrants' rental and interest, and on December 31st next would be indebted to the water company for further hydrants' rental, and prayed that the court order the city to pay this rental to him as receiver. The rental so sought by the receiver was for hydrants covered by the stipulated annual rental of $7,000, and for additional hydrants erected and maintained at the direction of the city, pursuant to the terms of the ordinance, and included all the rental subsequently awarded to Strong. This intervention in the Strong suit was long subsequent to the respective interventions in the O'Halloran suit of the trust company, Kate J. Dana, and Grace Whiting, administratrix, hereinafter stated.

January 25, 1897, a decree of foreclosure was entered in the Strong suit, in which Summerfield, as receiver, was designated as an intervening petitioner, and in which, after reciting notice to and the presence of all the parties to that suit, including the receiver, the matter of the hydrants' rental there in controversy was dealt with as follows: "And the court doth further find that in and by said ordinance of the city of Topeka, known as 'Ordinance No. 400,' the defendants the city of Topeka and the Topeka Water Supply Company undertook and agreed that, should the Topeka Water Supply Company, in the construction of its works, deem it expedient to issue its first mortgage bonds to bear interest at a rate not exceeding seven per centum per annum, that the hydrant rentals to become due from year to year from said city of Topeka for the use of the hydrants in said ordinance described, and which the said defendant the Topeka Water Supply Company thereby agreed to furnish to the said city, should be considered and set aside as net earnings of said Topeka Water Supply Company, and the same should be paid over semiannually by said city of Topeka to the fiscal agent of the state of Kansas in the city of New York for the payment exclusively of the interest coupons of said bonds as the same should from time to time become due and payable, and to provide a sinking fund for the payment of said bonds; and the court doth further find that the said Topeka Water Supply Company did deem it expedient to and did issue its first mortgage bonds as contemplated and provided in said ordinance, to wit, the bonds heretofore mentioned, and secured by said mortgage or trust deed to the complainant William B. Strong, as trustee, and that it became and was the duty of the defendant the city of Topeka to pay said hydrant rentals semiannually on the 1st day of January, A. D. 1894 [1895], and on the 1st day of July, A. D. 1895, and on the 1st day of January, A. D. 1896, and on the 1st day of July, A. D. 1896, and on the 1st day of January, 1897, to the fiscal agency of the state of Kansas in the city of New York, for the payment exclusively of the interest coupons of said

bonds secured by the mortgage or deed of trust aforesaid to William B. Strong, as trustee, and to provide a sinking fund as aforesaid; but that the said defendant the city of Topeka was in doubt as to its duty in the premises, and did not pay over the same to the fiscal agency of the state of Kansas in the city of New York for the payment of the interest coupons on said bonds secured by the mortgage to the complainant William B. Strong, as trustee, but retained the same in its possession, and that it now has in its possession the said hydrant rentals amounting to the sum of $36,975. And the court doth order, adjudge, and decree that the said sum of $36,975, be paid by defendant the city of Topeka to the solicitors of the complainant William B. Strong, as trustee, within twenty days from the entry of this decree, and that the said sum, when paid in hand to the said solicitors of the complainant as aforesaid, shall be credited and applied upon the amount herein found to be due and payable for principal and interest upon the said bonds and coupons secured by said mortgage or deed of trust to the complainant William B. Strong, trustee, and that the sum of money for which this decree shall be a lien shall thereupon be reduced by the amount so paid. And upon the payment of said sum of $36,975 by the city of Topeka as aforesaid the city of Topeka shall be and is hereby fully and wholly discharged and protected from any claim to said sum, or any part thereof, by either the said Topeka Water Supply Company, the Topeka Water Company, Elias Summerfield, as receiver of the Topeka Water Company, or William B. Strong, trustee, for any claim for any hydrant rentals from the city of Topeka from July 1, 1894, to and including January 1st, 1897."

No appeal was prosecuted from this decree, and no proceeding was begun or prosecuted to vacate or modify it in any respect, save as the intervention of Dana and Whiting, administratrix, in the trust company's suit, hereinafter stated, is asserted to be such a proceeding. In compliance with this decree the city paid the $36,975 of hydrants' rental to Strong, trustee, and the same was credited upon the amount which was by the decree found due under his mortgage.

February 26, 1895, long before the foreclosure decree in the Strong suit, the trust company filed in the court below an independent bill against the Topeka Water Company, O'Halloran, and Summerfield, as receiver, to foreclose the mortgage given to the trust company as trustee. In addition to otherwise stating a case for foreclosure, this bill alleged that the water company was altogether insolvent and unable to meet the claims and debts against it, and that there was grave danger that the complainant would lose a great part of its security for the payment of the bonds secured by its mortgage. The bill prayed that the complainant be placed in possession of the mortgaged premises personally, or that a receiver be appointed to carry on the business of the water company and receive the income pending foreclosure. Process in this suit is stated by the master to have been served the same day upon which the bill was filed.

March 18, 1895, the trust company, by leave of the court, and in furtherance of the purpose of its foreclosure suit, filed, in the O'Halloran suit, an intervening petition, referring to such foreclosure suit, setting forth the substance of the bill therein, and praying for the surrender of the mortgaged property to a receiver to be appointed in the trust company's suit, and for general relief. No action was taken by the court upon this intervening petition before September 27, 1895, when an order was entered extending the existing receivership in the O'Halloran suit over the foreclosure suit of the trust company. The O'Halloran and Trust Company suits seem to have been treated thereafter as in some respects consolidated.

August 31, 1895, Kate J. Dana and Grace Whiting, administratrix, by leave of the court, filed in the O'Halloran suit separate intervening petitions in the nature of creditors' bills. The purpose of these petitions was to obtain satisfaction of two judgments obtained against the water company by Dana and Whiting, administratrix, respectively, on May 5, 1894, and October 23, 1894, in the district court of Shawnee county, Kan., in actions prosecuted against the water company to recover for personal injuries occurring in December, 1891, through the negligent operation of one of the water company's hydrants in one of the streets of Topeka. No action was taken by the court upon these

petitions before October 11, 1895, when an order was entered in the O'Halloran suit to the effect that "all rights, priority, or claims" which Dana and Whiting, administratrix, or either of them, "can in law or equity assert against any of the past, present, or future income or property in the hands of the receiver, will be preserved and protected upon the final hearing and decree."

December 6, 1895, a decree of foreclosure was entered in the trust company's suit, fixing the amount of the debt due under its mortgage at $1,080,000, with interest from August 1, 1893, declaring that the mortgage covered "the income, rents, profits, emoluments, and moneys derived from said waterworks, and including any revenues from any source whatever," and embracing other findings which show that under the terms of the mortgage the trust company was entitled to enforce the pledge of income as an incident to its foreclosure proceedings. Under this decree the mortgaged property was sold for $525,000 to a representative of a reorganization committee of bondholders, the sale being confirmed August 3, 1896.

April 22, 1897, the balance of the decree in the Strong suit, after deducting the hydrants' rental paid to Strong by the city thereunder, was sold and transferred to the trust company.

March 30, 1898, the receiver, under the court's direction, paid from the income in his hands the balance of O'Halloran's judgment, upon which the receivership was originally based; and in May, 1898, the Topeka Water Company was dissolved by a judgment in quo warranto proceedings, prosecuted by the state of Kansas in one of the courts of that state. No steps were taken by Dana or Whiting to revive against the receiver their judgments against the water company. A receiver still continues in charge of the property.

January 9, 1895, before any of the interventions in the O'Halloran suit, and while the only parties thereto were O'Halloran and the water company, the court, by an order entered in that suit, without notice to either of the mortgagees, authorized the receiver to improve the waterworks plant in his charge by purchasing a new and improved pumping engine with enlarged capacity, and by sinking two new wells, all to be paid for with any moneys coming into the hands of the receiver, and not to exceed $25,000 in cost. The master's report finds that $19,972.76 was expended under this authorization; that this expenditure began soon after the order was made; that "the entire sum * * * had either been expended or obligations for its expenditure created by the receiver before the date of the filing of the petitions of intervention on the 31st day of August, 1895, by Kate J. Dana and Grace Whiting, administratrix," and that this expenditure was "not for repairs or for ordinary construction," but was "for the permanent improvement and betterment of the property." These findings of the master are acquiesced in by all of the parties.

Certain earnings of the water company, spoken of as "South Topeka hydrants' rental," earned prior to March 18, 1895, are involved in an action at law for their recovery now being prosecuted by the receiver against the city.

Protracted litigation affecting the franchise obtained by the water company from the city was had between the city and the receiver, in which the receiver was represented by A. L. Williams as attorney. The compensation allowed to Williams by the court and paid by the receiver was $7,500, but there had been no express agreement respecting this compensation. The service rendered before August 31, 1895, bears such relation to the entire service as to make that rendered prior to that date worth $6,000; but what portion of the service was rendered prior to March 18, 1895, is not shown.

The taxes for the year 1895, upon the property in the charge of the receiver were not due or payable under the laws of Kansas until November 1, 1895, and were not paid by the receiver until a still later date.

Prior to the rendition of the decree from which these appeals are prosecuted, no order was made determining what receivership burdens or obligations should be borne by the income earned subsequently to the intervention of the trust company in the O'Halloran suit, or otherwise charging any portion of such burdens or obligations upon or against any designated part of the income or property under the court's control. The present appeals question portions of the decree entered in the court below January 5, 1903, upon the intervening petitions of Dana and Whiting, administratrix, in the trust company suit.

That decree is to the effect that: (1) The judgments of Dana and Whiting, administratrix, are in full force and effect for all the purposes of these proceedings. (2) The intervention of Dana and Whiting, administratrix, in the O'Halloran suit on August 31, 1895, operated from that date as an equitable levy, and gave them for the satisfaction of their judgments a lien upon all the free assets and income of the water company, their judgment debtor. (3) Upon the extension of the receivership to the trust company suit on September 27, 1895, and not before, the future income of the water company became impounded or sequestered for the benefit of the trust company under its mortgage. (4) Strong did not, by the ordinance of the city, his mortgage, or the decree in his foreclosure suit, become entitled to any of the hydrants' rental awarded to him by that decree, and, notwithstanding the decree, Dana and Whiting have a first and superior lien upon such of this rental as was earned prior to September 27, 1895. (5) Dana and Whiting, administratrix, have a first and superior lien upon the South Topeka rental involved in the pending action by the receiver against the city, subject to a reasonable deduction for the expenses of recovery. (6) The disbursements for an engine and wells under the order of January 9, 1895, made prior to the extension of the receivership to the trust company's suit, on September 27, 1895, should be charged upon the income prior to that extension, and the later disbursements under that order should be charged upon the subsequent income. (7) Of the $7,500 paid to Williams, $6.000 should be charged upon the income prior to such extension of the receivership, and $1,500 upon the subsequent income. And (8) the taxes for 1895 should be charged upon the income subsequent to the extension of the receivership. Other portions of the decree become immaterial in the view here taken.

Certain statutes of Kansas bearing upon the controversy are printed in the General Statutes of 1901, and are as follows:

"Sec. 1274. Corporations shall have power to borrow money on the credit of the corporation not exceeding its authorized capital stock, and may execute bonds or promissory notes therefor, and may pledge the property and income of the corporation."

"Sec. 4216. In the absence of stipulations to the contrary, the mortgagor of real property may retain the possession thereof."

"Sec. 4848. * * * No real estate shall be sold for the payment of any money, or the performance of any contract or agreement in writing, in security for which it may have been pledged or assigned, except in pursuance of a judgment of a court of competent jurisdiction ordering such sale."

Charles Blood Smith (W. H. Rossington and Clifford Histed, on the brief), for Atlantic Trust Company and others.

G. C. Clemens and A. W. Dana (J. G. Waters and E. F. Hilton, on the brief), for Kate J. Dana and others.

Before SANBORN, THAYER, and VAN DEVANTER, Circuit Judges.

VAN DEVANTER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

1. The statutes of Kansas (sections 4883, 4889, Gen. St. 1901) restrict to a period of one year the time for reviving judgments "where either or both parties die after judgment and before satisfaction thereof." The water company was dissolved in May, 1898, by a judgment in quo warranto, and the interveners, Dana and Whiting, have taken no steps in the state court wherein their judgments were obtained to revive them against the receiver. Upon these facts the trust company strongly urges that these judgments have become mere nullities, and form no basis for the relief sought. Such a result does not flow from the situation stated. Neither at common law nor under the statutes of Kansas does a judgment for the payment of money become a mere

nullity upon the death of the judgment debtor. It still stands as an adjudication of the merits and amount of the creditor's demand. No defense can be interposed against it which existed before the judgment was entered and could have been asserted in the original action. The judgment debtor's death at most makes the judgment dormant—inoperative, unless revived, so far as the issuance of an execution and the enforcement of any statutory judgment lien are concerned. 2 Freeman on Judgments, §§ 442, 446; Scroggs v. Tutt, 23 Kan. 181, 189. But the interveners do not seek the issuance of an execution or the enforcement of any statutory lien. They seek satisfaction of their judgments out of personal assets of the water company in the custody of the receiver, upon which they claim to have effected an equitable levy, and to have acquired an equitable lien by their intervention in the receivership suit before the water company was dissolved. The rights, if any, obtained by these interventions rest upon recognized principles of equity. They attached while the judgments were fully operative, and neither a levy under an execution at law nor the preservation of a judgment lien under the statutes of Kansas is essential to their continued existence or enforcement. The dissolution of the water company and the absence of proceedings to revive the judgments do not affect interveners' rights. Lake Superior Iron Co. v. Brown, Bonnell & Co. (C. C.) 44 Fed. 539; Davidson v. Burke, 143 Ill. 139, 32 N. E. 514, 36 Am. St. Rep. 367; Young v. Kelly, 3 App. D. C. 296, 305; Bacon v. Robertson, 18 How. 480, 486, 15 L. Ed. 499; 2 Morawetz, Priv. Corp. §§ 1033, 1035.

2. The original intervening petitions of Dana and Whiting are partly framed upon the theory that the liability of the water company to them, established by their judgments, was produced by the ordinary operation of its waterworks plant, and should be classed as ordinary operating expenses, and be accorded priority over the mortgage debts in payment out of the earnings during the receivership and out of the proceeds of the sale of the mortgaged property. This theory cannot be sustained. The liability was not incurred in the course of the receivership, but was incurred at a time when the waterworks was being operated by the water company. It is not based upon anything which tended to preserve or enhance the value of the mortgage security, but is based upon personal injuries to persons not in the employ of the water company, caused by the negligence of the company, and occurring more than two years before the receivership. It is well settled by the decisions of this and other courts that such claims are not preferential debts. St. Louis Trust Co. v. Riley, 16 C. C. A. 610, 70 Fed. 32, 30 L. R. A. 456; Farmers' Loan & Trust Co. v. Northern Pacific R. R. Co., 24 C. C. A. 511, 79 Fed. 227; Veatch v. American Loan & Trust Co., 25 C. C. A. 39, 79 Fed. 471; Farmers' Loan & Trust Co. v. Nestelle, 25 C. C. A. 194, 79 Fed. 748; Farmers' Loan & Trust Co. v. Longworth, 27 C. C. A. 541, 83 Fed. 336; Veatch v. American Loan & Trust Co., 28 C. C. A. 384, 387, 84 Fed. 274, 277. Any preference or priority to which these interveners may be entitled was obtained solely by their intervention in the receivership suit.

3. When the judgments in favor of Dana and Whiting were rendered the entire property of the water company was in the possession

of a receiver, appointed in a judgment creditor's suit, who was carrying on the business of the company and collecting its income. This property was also covered by two mortgages soon after in process of foreclosure. Being unable to employ an execution or other proceeding at law in obtaining satisfaction of their judgments, Dana and Whiting secured the leave of the court and intervened in the receivership suit through petitions in the nature of creditors' bills. These operated as equitable levies, and fastened upon the property and income of the water company in the receiver's hands equitable liens for the satisfaction of interveners' judgments, subject to prior liens and superior equities. 2 Barbour's Ch. Pr. 157; Miller v. Sherry, 2 Wall. 249, 17 L. Ed. 827; American Bridge Co. v. Heidelbach, 94 U. S. 798, 800, 24 L. Ed. 144; Young v. Kelly, 3 App. D. C. 296, 305; High on Receivers (3d Ed.) § 254c. As the tangible property was insufficient to pay the mortgage indebtedness, the intervention was effective, if at all, only against the income, and the principal controversy here is as to how far this income is subject to prior liens and superior equities. The interveners concede that the trust company's mortgage pledged the income of the water company, as well as the corpus of its property, and that by the order extending the receivership to the trust company's suit this pledge became effective against the income subsequently earned, so as to charge it with a lien in favor of the trust company prior and superior to that obtained by their intervention.

4. Did the pledge of income in the trust company's mortgage become effective against income earned prior to the extension of the receivership, September 27, 1895? If not, the intention of the parties to that instrument, declared in unambiguous terms, has miscarried, and creditors who were less diligent than the trust company, and who had no mortgage or other lien upon the water company's property, and no pledge of its income, have secured a substantial part of the income, earned after the time when the trust company asserted its right under the pledge. O'Halloran, a judgment creditor, was the first to move against the water company's income, and in his suit the receiver was originally appointed. O'Halloran has been paid, and is no longer a party to the controversy, which now really concerns only the trust company as second mortgagee, or the bondholders whom it represents, and the intervening judgment creditors, Dana and Whiting. The trust company was the next to move. It commenced a suit to foreclose its mortgage and to obtain the income therein pledged. The water company was then insolvent, and its entire property was in the possession of the receiver. In its bill the trust company distinctly claimed the income, and prayed that it be placed in possession of the mortgaged property under the terms of the mortgage, or that a receiver be appointed to take possession and collect the income for its benefit. The water company, not being in possession, could not perform its undertaking to deliver possession of the property to the trust company, and thus place it in a position to receive the income. Nor could the receiver surrender the possession without the direction of the court. Under the court's appointment, the receiver was exercising the water company's right to collect and disburse the income until the trust company could and should lawfully claim it under the pledge in its mort-

gage. As against the trust company, he had no better right to the income than the water company, and the court could give him none at the instance of a creditor, like O'Halloran, who had no prior or superior pledge or lien. The contingency had happened when, under the terms of the mortgage, the trust company was entitled to claim the income, and when, for the protection of the bondholders, it was essential that the pledge should be enforced. The existing receivership did not impair the pledge, or render the property or its income less subject to the mortgage to the trust company than if the property was still in the possession of the water company. Freedman's Savings Co. v. Shepherd, 127 U. S. 494, 507, 8 Sup. Ct. 1250, 32 L. Ed. 163; Kneeland v. Trust Co., 136 U. S. 89, 97, 10 Sup. Ct. 950, 34 L. Ed. 379. It altered the situation only to the extent that it affected the manner in which the pledge should be asserted to make it effective. The situation and the course to be pursued could not well be better stated than is done in Seibert v. Minneapolis & St. Louis Ry. Co., 52 Minn. 246, 256, 53 N. W. 1151, 1154, where the court says:

"If, however, the receiver is appointed solely for the benefit of the plaintiff. in an action to which the senior mortgagees of income are not parties, and they do not choose to acquiesce, what are they to do? They cannot take possession from the mortgagor; the action of the court has disabled them to do that. Shall they sue the receiver for the possession? The court would hardly permit that. Shall they petition the court to discharge him, or direct him to turn the property over to them? There might be reasons—there were in this case—growing out of questions of priority as to part of the property, and to the earnings properly attributable to that part, why the court could not properly grant such a petition. Being unable to take the possession from the mortgagor or from the receiver, what, then, can they do, except, if they are not parties to the action, to come in by intervention, or, if they are parties, to petition the court that there be paid to them by the receiver, out of the earnings which shall come into his hands, such part as, but for his appointment, they would have had the right to receive and apply on their mortgages. * * * When such mortgagees are in the action, and so in position to make their demand upon the court, it is entirely immaterial in what form it is made, so that it is clearly made, and presents to the court the ground of their claim, if it be not already before it. And at whose instance the receiver was appointed, and on what ground he was appointed, are wholly immaterial. Their right to demand that the earnings which shall come into the hands of the receiver shall be held for and paid to them does not depend on those things, but on the facts that, by taking the property through its receiver, the court has placed itself, so far as such senior mortgagees are concerned, in the position of the mortgagor, and that their only remedy is by application to the court."

By placing the property of the water company in the custody of a receiver, and carrying on the business of the company through him, the court assumed the burden, during the continuance of the receivership, of administering the property and collecting the income for the benefit of whomsoever was entitled thereto, giving due effect to such priorities of right as were or should be acquired under equitable levies of judgment creditors or pledges made by the debtor company. Hitz v. Jenks, 123 U. S. 297, 306, 8 Sup. Ct. 143, 31 L. Ed. 156; Dow v. Memphis & Little Rock R. R. Co., 124 U. S. 652, 655, 8 Sup. Ct. 673, 31 L. Ed. 565; Union Bank of Chicago v. Kansas City Bank, 136 U. S. 223, 236, 10 Sup. Ct. 1013, 34 L. Ed. 341; Porter v. Sabin, 149 U. S. 473, 479, 13 Sup. Ct. 1008, 37 L. Ed. 815; Ames v. U. P. Ry. Co.

(C. C.) 60 Fed. 966, 969. A pledge of income does not become effective so long as the mortgagor is permitted to remain in possession of the property and to receive and disburse the earnings. Galveston Railroad v. Cowdrey, 11 Wall. 459, 482, 483, 20 L. Ed. 199; Gilman v. Illinois & Mississippi Telegraph Co., 91 U. S. 603, 616, 617, 23 L. Ed. 405; American Bridge Co. v. Heidelbach, 94 U. S. 798, 24 L. Ed. 144; Freedman's Savings Co. v. Shepherd, 127 U. S. 502, 503, 8 Sup. Ct. 1250, 32 L. Ed. 163; United States Trust Co. v. Wabash Ry. Co., 150 U. S. 287, 308, 14 Sup. Ct. 86, 37 L. Ed. 1085. For the same reason the pledge is not operative so long as the mortgagee, by remaining silent, acquiesces in the possession of the property and the collection of the income by a receiver for purposes other than the satisfaction of the mortgage debt. Sage v. Memphis & Little Rock R. R. Co., 125 U. S. 361, 378, 8 Sup. Ct. 887, 31 L. Ed. 694; Seibert v. Minneapolis & St. Louis Ry. Co., 52 Minn. 255, 53 N. W. 1151. The mortgagor was not in possession, but a receiver was, and he was not collecting the income for the benefit of the trust company. To be effectual, a demand should generally be addressed to one who possesses the authority to determine whether it shall be granted or refused. Here the demand for the income could not be acted upon by others than the court, and it so vitally affected the existing receivership that, to be effectual, it was essential it should be presented to the court in the receivership suit. The trust company, therefore, in pursuance of the only course open to it—clearly the correct one—obtained the leave of the court, and, intervening in the receivership suit, filed therein a petition setting forth the facts showing its right to the income, and containing ample prayers to entitle its claim to recognition. This intervention in aid of its pending suit for a foreclosure was an effective assertion of the trust company's claim, and operated to charge with the lien of its mortgage all the income subsequently earned. Dow v. Memphis & Little Rock R. R. Co., supra; Sage v. Memphis & Little Rock R. R. Co., 125 U. S. 378, 379, 8 Sup. Ct. 887, 31 L. Ed. 694; Seibert v. Minneapolis & St. Louis Ry. Co., 52 Minn. 256, 53 N. W. 1151; Hook v. Bosworth, 12 C. C. A. 208, 214, 64 Fed. 443, 448, 24 U. S. App. 341, 349; Central Trust Co. v. Wabash, etc., Ry. Co. (C. C.) 46 Fed. 26, 34; High on Receivers, § 254c. It was not necessary that a new receiver be appointed under its bill, or that the existing receivership be formally extended to its suit. These were matters beyond its control. It is sufficient that after this assertion of its claim the existing receivership was continued, and the subsequent income brought within the court's control, that in the decree subsequently entered in the foreclosure suit, to which the water company and the receiver were parties, all questions going to the existence of the pledge and the right to enforce it at the time of the trust company's intervention in the receivership suit were settled and determined favorably to the trust company, and that this income is needed to satisfy the mortgage debt. The income was not something which could be dealt with or sold under the foreclosure decree, like the real and personal property covered by the mortgage, but, being money, or rights in action which were being converted into money, had to be impounded and preserved so that upon foreclosure of the mortgage it might be forthcoming under the pledge, and be capable of application upon the

mortgage debt. It requires no further statement or discussion to show that the means employed for the enforcement of this pledge of income have been by a suit for foreclosure in a court of equity and other proceedings in that court consistent with the theory that the mortgage gave a lien upon the income and did not convey the title. As to the income earned subsequently to the trust company's intervention in the receivership suit, possession thereof was obtained through a receiver in a suit where the mortgagee was asserting a right to the income under its mortgage. The course pursued is in entire harmony with the views expressed by the Supreme Court of Kansas in Seckler v. Delfs, 25 Kan. 159, and with those of Mr. Justice Brewer in Mercantile Trust Co. of New York v. Missouri, Kansas & Texas Ry. Co. (C. C.) 36 Fed. 221, 225, 1 L. R. A. 397. It is not material that the mortgagee may have also claimed, under the terms of the mortgage, a right to have the possession of the mortgaged property surrendered to it, and to be permitted to collect the income without the aid of a receiver. The income could be subjected to the lien of the mortgage without sustaining this claim, and a suitor does not, by making his claim too broad, lose his right to relief to which he is otherwise entitled. Wallace v. Loomis, 97 U. S. 146, 160, 161, 24 L. Ed. 895. It may be that, under the authority to pledge income specially and expressly given to corporations in Kansas (Gen. St. 1901, § 1274), the trust company's mortgage is excepted from the operation of the statute (sections 4216 and 4848) which controlled the decision in Seckler v. Delfs, and that in that state it is competent for mortgagor and mortgagee to stipulate, in a corporate income mortgage like this, that the mortgagee, upon default in payment by the mortgagor, may take possession of the property and collect the income without the aid of a receiver (see Seibert v. Minneapolis & St. Louis Ry. Co., 52 Minn. 146, 253, 254, 53 N. W. 1151); but the facts of this case do not require a decision of this question. The cases of Teal v. Walker, 111 U. S. 242, 4 Sup. Ct. 420, 28 L. Ed. 415, and Couper v. Shirley, 21 C. C. A. 288, 75 Fed. 168, relied upon by counsel for the judgment creditors, presented controversies growing out of mortgages of real property in the states of Oregon and Washington, the statutes of which, without recognition or reservation of any right of the parties to stipulate otherwise, declare, in effect, that the mortgagor of real property shall be entitled to the possession, and in consequence to the rents and profits, until "foreclosure and sale." Unlike this, the Kansas statute declares that, "in the absence of stipulations to the contrary," the mortgagor shall be entitled to retain the possession. The inhibition in Kansas, as construed in Seckler v. Delfs, seems to be not against a pledge of the rents and profits accruing prior to foreclosure and sale, or against stipulations affecting the possession and reasonably necessary to make the pledge of income of advantage as a security, but against treating the mortgage as a conveyance of title to the property or rents and profits, and against enforcing the mortgage stipulations, whether relating to the property or the rents and profits, otherwise than through the aid of a court of equity. The difference in the local laws is such that Teal v. Walker and Couper v. Shirley are not of controlling or persuasive application to an income mortgage, upon property in Kansas, given by a Kansas corporation under the ex-

press authority of the laws of that state. The judgment creditors, Dana and Whiting, did not move against the water company's income until more than five months after the trust company, by reason of its superior diligence in asserting the pledge in its mortgage, had made the same effective against future income. It follows that the equitable levy and lien effected by the intervention of Dana and Whiting in the receivership suit is operative only upon income earned prior to the trust company's intervention, and not required to satisfy the claim of O'Halloran, or to satisfy the obligations of the receivership properly chargeable against such prior income.

5. Does the decree in the Strong suit bar Dana and Whiting from claiming the rental there awarded to Strong under his mortgage? Whether that mortgage covered this rental, and, if it did, whether Strong took the steps necessary to make it effective in that regard, are questions which are determined in his favor by the decree in his suit. If the court had jurisdiction of the subject-matter, and had before it the requisite parties to bind Dana and Whiting, further consideration of these questions is precluded. As shown in the foregoing statement, Strong's bill, the city's answer, and the answer or intervening petition of the receiver make it manifest that it was the intention of the parties to present for the court's decision in that suit a controversy respecting rental then due from the city under its contract with the water company. Strong claimed this contract was covered by his mortgage, and especially claimed that the city and water company were obligated, by the terms of the ordinance, to set apart and pay over to the Kansas fiscal agency in New York for application upon the interest and principal secured by his mortgage the rental for the original 150 hydrants. There was no occasion for making the city a party to Strong's bill, unless it was to secure the payment of the rental to Strong. The receiver claimed all of the rental as part of the income of the water company, which he, as receiver, was directed to collect and reduce to possession. The city, while apparently admitting the rental to be due to the water company, denied Strong's right to it. It was the case of two rival claimants for payment of the same admitted debt, and was a matter growing out of Strong's mortgage, and affecting its extent as a security. Both Strong and the receiver were claiming through and asserting the right of the water company against the city. That the court had jurisdiction of the subject-matter is clear. While the receiver was not made a party to the Strong bill, he might have been, and his subsequent appearance or intervention in that suit was not excepted to. This appearance or intervention was fully justified by the direction, given to the receiver at the time of his appointment, to defend any suit seeking to establish a lien against the water company's property, and to prosecute any action necessary for the collection of any sum due to the company. Shields v. Coleman, 157 U. S. 168, 178, 15 Sup. Ct. 570, 39 L. Ed. 660. The receiver was therefore to be treated as though he had originally been made a defendant (French v. Gapen, 105 U. S. 509, 525, 26 L. Ed. 951), at least so far as the rental was concerned. Particularly is this true since the Strong suit and the receivership suit were both in the same court. By its decree the court resolved the controversy, with respect to certain of the rental, in favor

of Strong and against the receiver. The decree was rendered January 25, 1897. No appeal therefrom was ever prosecuted. One prayed by the trust company was allowed, but not perfected. The time for an appeal expired July 25, 1897. Act March 3, 1891, c. 517, § 11, 26 Stat. 829 [U. S. Comp. St. 1901, p. 552]; United States v. Baxter, 2 C. C. A. 410, 51 Fed. 624. No effort has been made to have the decree reversed or modified upon a bill of review for error in law apparent upon the face of the decree or record, and it is now too late to do so. Thomas v. John Harvie's Heirs, 10 Wheat. 146, 6 L. Ed. 287; Kennedy v. Georgia State Bank, 8 How. 586, 609, 12 L. Ed. 1209. Nor is it now sought to have the decree reversed or modified on account of any newly discovered evidence, or to have it vacated on account of fraud or otherwise. The intervening petitions of Dana and Whiting, filed January 20, 1899, almost two years after the decree was rendered, proceed upon the theory that, as matter of law, the decree should have rejected any claim of Strong to hydrants' rental, and that the petitioners are not bound by the decree because not parties to it. No misconduct or bad faith is charged against the receiver, and the only imputation of bad faith is embraced in the charge that the trust company "caused the said decree" to order the city to pay the rental to Strong, "whereby through the cunning" of the trust company and another company, which acquired the waterworks after the foreclosure sale, the rental was put beyond the enforcement of the petitioners' equitable levy. The petitioners do not state the manner in which or the means by which the trust company caused this provision to be inserted in the decree, or what constituted the cunning spoken of. As made, the charge is without effect (Ambler v. Choteau, 107 U. S. 586, 591, 1 Sup. Ct. 556, 27 L. Ed. 322; Fogg v. Blair, 139 U. S. 118, 127, 11 Sup. Ct. 476, 35 L. Ed. 104; Ritchie v. McMullen, 159 U. S. 235, 241, 16 Sup. Ct. 171, 40 L. Ed. 133), and it seems to have been abandoned.

Of course, the Strong decree binds the receiver, and bars any further action or suit by him, or others acting in the same right, against the city for the rental awarded to Strong. The creditors, Dana & Whiting, were not actual parties to the Strong suit, but they were represented by the receiver, and are as much bound by the decree as he is. They were what are sometimes termed quasi parties. Upon the appointment of the receiver the right to enforce the payment of hydrants' rental and other rights in action due to the water company, or becoming due during the continuance of the receivership, vested in the receiver, and he became the proper party to prosecute all necessary suits for that purpose, and to defend such suits as should be commenced for the purpose of establishing claims against or rights to the property of the water company. Porter v. Sabin, 149 U. S. 473, 478, 13 Sup. Ct. 1008, 37 L. Ed. 815; Doggett v. Railroad Co., 99 U. S. 72, 78, 25 L. Ed. 301; Express Co. v. Railroad Co., 99 U. S. 191, 199, 25 L. Ed. 319; Gray v. Davis, 10 Fed. Cas. 1006, 1009; Davis v. Gray, 16 Wall. 203, 217, 219, 21 L. Ed. 447; High on Receivers (3d Ed.) § 316. In such suits, whether brought by the receiver or against him, it is not necessary, and generally is not even proper, to join creditors of the debtor company with the receiver as parties. Doggett v. Railroad Co., Express Co. v. Railroad Co., Gray v. Davis, supra. The

receiver is the representative of the court and of all the parties in interest, and can neither surrender to others nor divide with them the management of the prosecution or defense of such suits or the responsibility therefor. Doggett v. Railroad Co.; Express Co. v. Railroad Co.; Porter v. Sabin, 149 U. S. 479, 13 Sup. Ct. 1008, 37 L. Ed. 815; Gray v. Davis, supra; Ames v. Union Pacific Ry. Co., supra; High on Receivers (3d Ed.) §§ 134, 135, 650; Jones on Railroad Securities, § 495. Where it is necessary to apply for and obtain leave of court to sue a receiver in his official capacity, "it is not essential to the jurisdiction of the court over the receiver, or to the validity of the order, that the application should be based upon notice to the parties in the action wherein the receiver was appointed. It is sufficient that leave be granted by the court having control over the receiver, upon notice to him, against whom alone the cause of action exists, and against whom the proceedings must be brought." High on Receivers (3d Ed.) § 265; Potter v. Bunnell, 20 Ohio St. 150, 158; Farwell v. Great Western Railroad Co., 161 Ill. 522, 618, 44 N. E. 891. The principle underlying the several cases bearing upon the representative character of a receiver is well shown in Gray v. Davis, supra. It was a case wherein a receiver appointed in a railroad foreclosure suit filed a bill against officers of the state of Texas to enjoin them from taking certain action calculated to impair property interests of the railroad company in the charge of the receiver, and held by him for the benefit of the creditors of the company. A demurrer was interposed upon the ground that the creditors to be affected were not made parties to the bill. The demurrer was overruled, the circuit judge saying: "The creditors are neither necessary nor proper parties, because they are represented by the complainant who is a receiver." Gray v. Davis, 10 Fed. Cas. 1009. This ruling was affirmed in the Supreme Court, where it was stated:

"A receiver is appointed upon a principle of justice for the benefit of all concerned. Every kind of property of such a nature that, if legal, it might be taken in execution, may, if equitable, be put into his possession. Hence the appointment has been said to be an equitable execution. He is virtually a representative of the court, and of all the parties in interest in the litigation wherein he is appointed. He is required to take possession of property as directed, because it is deemed more for the interests of justice that he should do so than that the property should be in the possession of either of the parties in the litigation. He is not appointed for the benefit of either of the parties, but of all concerned." Davis v. Gray, 16 Wall. 217, 21 L. Ed. 447.

Mr. Calvert, in his work on Parties in Equity, says (pages 20, 21):

"There are certain persons whose representative character is derived from the law. The most familiar instance is that of executors and administrators in respect of the personal estate of their testator or intestate. Whenever a suit is instituted which affects that personal estate, all the legatees have precisely that kind of interest which has been specified in the general rule; but they are unnecessary parties, inasmuch as by law their interests are protected. They themselves may be said to be represented in the person of the executor or administrator. It would be very inconvenient to bring them all in their own persons before the court, so they are allowed to appear by their representatives. Thus an adequate protection is provided for their interests, and the spirit of the general rule is adopted, although the letter of it is, for the sake of convenience, evaded."

The relation of a receiver to intervening creditors, like these, is much the same as that of a mortgage trustee to the bondholders.

The rights and lien of the bondholders must be worked out and enforced, in greater part, through the trustee, and those of the intervening creditors through the receiver. Being bound by both what is done by and what is done against his representative, the bondholder or intervening creditor, as the case may be, should have some reasonable and timely concern for whatever is done. A receiver is always under the control of the court, and if these creditors believed a wrong was done to them by the Strong decree it was open for them, upon a reasonable showing, to invoke this control for the purpose of effecting the institution of appropriate proceedings, by appeal or otherwise, to remedy that wrong. The court could have directed the receiver to act, or have permitted the creditors to do so in the receiver's name; but application for the institution of any such proceeding does not appear to have ever been made by the creditors either to the receiver or to the court. "It cannot be doubted that, under some circumstances, a trustee may represent his beneficiaries in all things relating to their common interest in the trust property. He may be invested with such powers and subjected to such obligations that those for whom he holds will be bound by what is done against him, as well as by what is done by him. The difficulty lies in ascertaining whether he occupies such a position, not in determining its effect if he does. If he has been made such a representative, it is well settled that his beneficiaries are not necessary parties to a suit by him against a stranger to enforce the trust. (Shaw v. Norfolk Co. R. R. Co., 5 Gray, 171; Bifield v. Taylor, 1 Beat. 91; Campbell v. R. R. Co., 1 Woods, 376 [Fed. Cas. No. 2,366]; Ashton v. Atlantic Bank, 3 Allen, 220); or to one by a stranger against him to defeat it in whole or in part (Rogers v. Rogers, 3 Paige, 379; Wakeman v. Grover, 4 Paige, 34; Winslow v. M. & P. R. R. Co., 4 Minn. 317 [Gil. 230, 77 Am. Dec. 519]; Campbell v. Watson, 8 Ohio, 500). In such cases the trustee is in court for and on behalf of the beneficiaries; and they, though not parties, are bound by the judgment, unless it is impeached for fraud or collusion between him and the adverse party. The principle which underlies this rule has always been applied in proceedings relating to railway mortgages, where a trustee holds the security for the benefit of the bondholders. It is not, as seems to be supposed by the counsel for the appellants, a new principle developed by the necessities of that class of cases, but an old one, long in use under analogous circumstances, and found to be well adapted to the protection of the rights of those interested in such securities, without subjecting litigants to unnecessary inconvenience. * * * If the creditors, mindful of their interests, are dissatisfied with the manner in which he represents them in suits that are pending, they may, under proper circumstances, intervene, and ask to be made parties, so as to speak for themselves; but their adversary need not go after them, except under the direction of the court." Kerrison, Assignee, v. Stewart, 93 U. S. 155, 160, 162, 23 L. Ed. 843. "The trustee of a railroad mortgage represents the bondholders in all legal proceedings carried on by him affecting his trust, to which they are not actual parties, and whatever binds him, if he acts in good faith, binds them. If a bondholder not a party to the suit can, under any circumstances, bring a bill of review, he can only have such relief as the

trustee would be entitled to in the same form of proceeding." Shaw v. Railroad Co., 100 U. S. 605, 611, 25 L. Ed. 757. See, also, Wallace v. Loomis, 97 U. S. 146, 163, 24 L. Ed. 895; Richter v. Jerome, 123 U. S. 233, 246, 8 Sup. Ct. 106, 31 L. Ed. 132; Vetterlein v. Barnes, 124 U. S. 169, 8 Sup. Ct. 441, 31 L. Ed. 400; Elwell v. Fosdick, 134 U. S. 500, 511, 10 Sup. Ct. 598, 33 L. Ed. 998; Kneeland v. Luce (2) 141 U. S. 491, 509, 12 Sup. Ct. 32, 35 L. Ed. 830; Credit Co. v. Arkansas Central R. R. Co. (C. C.) 15 Fed. 46, 52; Farmers' Loan & Trust Co. v. Kansas City, etc., R. R. Co. (C. C.) 53 Fed. 182, 185; Clyde v. Richmond, etc., R. R. Co. (C. C.) 55 Fed. 445, 448. "Given a suit in which there is jurisdiction of the parties, in a matter within the general scope of the jurisdiction of courts of equity, and a decree rendered will be binding, although it may be apparent that defenses existed, which, if presented, would have resulted in a decree of dismissal." Hollins v. Brierfield Coal & Iron Co., 150 U. S. 371, 380, 14 Sup. Ct. 127, 37 L. Ed. 1113. To the same effect is the decision in Stout v. Lye, 103 U. S. 66, 26 L. Ed. 428. The Strong decree binds Dana and Whiting, and precludes them from claiming any interest in the hydrants' rental awarded to Strong.

6. Should the cost of the new engine and additional wells incurred under the order of January 9, 1895, be charged in whole or in part upon the income earned after the pledge of income in the trust company's mortgage became effective, March 18, 1895? The question is not whether these improvements shall be paid for, but against what funds or income shall the completed payment of their cost be charged? The master found that this expenditure was "not for repairs or for ordinary construction," but was "for the permanent improvement and betterment of the property." The receiver's petition upon which the expenditure was authorized represented that the water company had "two pumping engines—one high-duty Gaskill, of four million gallons capacity, and one Knowles condensing pumping engine of three million gallons capacity. The latter bursted within the past twelve months two cylinders, which it would be very expensive to replace, and said engine has therefore not been used for a long time. Furthermore, this pump is unfitted for the direct pressure system in use at said works, for the reason that it is too light for that work, and is very expensive in the use of fuel. Your petitioner deems it necessary to purchase a new improved high-duty pumping engine of about four million gallons daily capacity." After stating that the supply of water was obtained "through six-inch well points near the bank of the Kansas river," the petition proceeded:

"When these well points were first put down, they furnished a sufficient supply of water, but they have become corroded, and from other causes said well points do not furnish more than half the original quantity of water, and not sufficient to answer the required purposes. Your petitioner, from consultation with capable engineers, and from his own knowledge, has become satisfied that, in order to procure a sufficient quantity of water, it will be necessary to sink near the banks of said river at least two wells fifty feet in diameter."

In his deposition, introduced in evidence by the intervening judgment creditors, the receiver testified:

"Q. Now, were these things you did under order of court in the nature of repairs on the plant as it already stood, or were they, or some of them, ad-

ditions to the plant, or renewals of parts of it? A. There was that new pump, and then the connecting therewith, and a new well, fifty feet in diameter, and then the boring out of the other pump, which was in bad shape, making new plungers, and all that sort of thing. Of course, some connections, valves, etc. Q. Make the plant more valuable? A. Well, it may be; yes, in a way. That was necessary to make the plant complete. It was never complete before. I will have to explain to you, perhaps.. They had a pumping station down here, and they had two small pumps, and of course it was inadequate for the business entirely. It could not give enough pressure, and the city complained, and notified that they would not pay any more hydrant rental if they did not get more pressure; and it was necessary to make a plant just where it is. Of course, it was more valuable. It was not of any value at all before. The well capacity was insufficient. It became absolutely necessary, to make it a self-sustaining plant. to sink that well. Q. Do you know whether these things were in contemplation by the company itself at the time you were appointed receiver? A. Yes, sir. Q. In other words, you carried out what the city [company] itself would have done? A. I was the manager of the company before the receivership, and I recommended these additions to make .it effective; but, of course, the company was in straits, and had no money to do it with, and had to stand off the council and everybody until we could get money after the receivership. Q. What money came in after you became receiver, that would not have come into the company if it had continued in business? A. I got just about the same money; it came just the same as before the receivership. Q. If the company got the same money that you got, why was not the company able to make these improvements which you were able to make as receiver? A. Because they paid interest on the bonds. After I became receiver we used the money to make improvements."

The record discloses no other evidence bearing upon the character of these improvements. This evidence and the master's finding, which is not excepted to, make it clear that the cost of these improvements was not a current expense incurred in the ordinary course of operating the mortgaged property, but was an expense outside of the ordinary course, and incurred, not in operation, which includes repair, but in reconstruction, enlargement, and permanent improvement. Lackawanna, etc., Co. v. Farmers' Loan, etc., Co., 176 U. S. 298, 315, 20 Sup. Ct, 363, 44 L. Ed. 475. .

When the order of January 9, 1895, was made, a receiver appointed under the bill of a judgment creditor (O'Halloran) was in possession of the property of the debtor company, and was operating its waterworks plant, and collecting the income thereof with a view to satisfying the claim of the judgment creditor therewith. The entire property was then covered by mortgages to Strong and the trust company, securing the payment of an aggregate indebtedness exceeding the salable value of the property, and this was disclosed in the bill under which ..the receiver was, appointed. The trust company's mortgage, which had been duly recorded, as clearly pledged the income, and made it a part of the bondholders' security, as it did the corpus of the property. The only difference is that the lien of such a mortgage upon the corpus is enforced upon default by foreclosure, while the lien upon the income is enforced upon default by impounding it by a due assertion of the right to it in the manner heretofore shown. It is the income earned thereafter, and not that earned theretofore, that, as against creditors of the mortgagor, is thus secured to the mortgagee. But a mortgage of income, even before it is made effective against future income in the sense just mentioned, gives to the mortgagee a vested right

which cannot be displaced, postponed, or impaired in the interest or at the instance of an unsecured creditor, any more than can the mortgage lien upon the corpus of the property. Until the trust company should be entitled to make the pledge of income in its mortgage effective against the future earnings, and should do so, the way was open for a judgment creditor of the water company, through a creditors' bill and the appointment of a receiver, to impound the income, and subject it to the payment of his claim. The satisfaction of the claim of the complaining creditor from assets of the debtor not otherwise adequately within the creditor's reach and unaffected by any prior lien or superior equity, is the controlling purpose of such a suit and receivership. They cannot, without the consent of the mortgagee, be made the medium of reconstructing, enlarging, or permanently improving mortgaged property, and of making the cost thereof a charge or lien upon the property or its income prior or superior to the mortgage. Nor is such a use of a creditors' suit and receivership rendered permissible because the work of reconstruction, enlargement, or permanent improvement is required to fit the mortgaged property for better, increased, or more economical service (Lackawanna, etc., Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 315, 20 Sup. Ct. 363, 44 L. Ed. 475), or because it tends to preserve or enhance the value of the mortgage security (Southern Ry. Co. v. Carnegie Steel Co., 176 U. S. 257, 296, 20 Sup. Ct. 347, 44 L. Ed. 458). The effect of work of this character cannot always be foretold with certainty. It may not accomplish all that is intended or expected, and may not prove beneficial in proportion to its cost, or at all. No risk or element of uncertainty such as this is contemplated when a mortgage lien is contracted, and none can be subsequently fastened upon the mortgage security without the consent of the mortgagee. A court of equity does not, by the appointment of a receiver, acquire absolute control over the property or general authority to displace contract liens. Kneeland v. Trust Co., 136 U. S. 89, 97, 10 Sup. Ct. 950, 34 L. Ed. 379; Thomas v. Western Car Co., 149 U. S. 95, 111, 13 Sup. Ct. 824, 37 L. Ed. 663; Union Loan & Trust Co. v. Southern, etc., Co. (C. C.) 51 Fed. 106; Savings, etc., Co. v. Bear Valley Irr. Co. (C. C.) 93 Fed. 339, 341. The order of January 9, 1895, was made, not at the instance of the trust company, or with its acquiescence, but without notice to it, and when it was not a party to the judgment creditors' suit, or in any wise responsible for the receivership. That company's foreclosure suit was commenced February 26, 1895, and its intervening petition, filed in O'Halloran's suit March 18, 1895, asserted its right under the mortgage, and charged that the existing receivership was not in the interest of the secured creditors, but was in the direct interest of the debtor company and of others who were endeavoring to continue their control over its affairs, and that the claim of O'Halloran could be satisfied from the income theretofore collected by the receiver. Among the prayers in this petition was one to the effect that, if O'Halloran had obtained a superior right to payment from the fund then in the possession of the receivers, the court direct immediate payment of the balance due upon his judgment, and terminate the existing receivership. This was not done, but the petition was not the less a protest against the continuance of the O'Halloran receivership, and against its use for purposes other

than the satisfaction of O'Halloran's claim. Disbursements under the order of January 9, 1895, began soon after it was made, and the entire cost of the engine and wells had been paid, or obligations for its expenditure created, by the receiver, before the rights of the trust company under its mortgage received recognition in the court below on September 27, 1895, by the order extending the receivership then existing to the company's foreclosure suit. Of the total expenditure for the engine and wells, $12,769.85 had been disbursed up to September 27, 1895. Referring to the balance, and to that date, the receiver testified:

"Q. You did not owe at that date for things actually furnished or labor actually done under that order up until that date the sum of $7,605.64 [?] did you? A. Of course, I do not remember the dates. I am of the impression that I owed nearly that much on that pump. I agreed to pay one-quarter when shipped, one-quarter when delivered, and the rest when turned over to us. The contract will speak for itself. I do not remember. Q. Which had all been furnished? A. Yes, sir."

The master found:

"The entire sum of $19,972.76 expended under said order of January 9, 1895, had either been expended or obligations for its expenditure created by the receiver before the date of the filing of the petitions of intervention on the 31st day of August, 1895, by Kate J. Dana and Grace Whiting, administratrix of Catherine M. Whiting, deceased, and before the order extending the receivership to the Atlantic Trust Company cause, made the 27th day of September, 1895."

Under such circumstances a specific objection, at the time of the extension of the receivership, to further disbursements under the court's authorization, would have been unavailing. For other reasons it was probably not necessary. The order authorizing the improvements did not express a purpose to make their cost a charge upon the mortgaged property or its income prior or superior to the mortgage lien, and the order extending the receivership did not express such a purpose. As shown by the master's report, there was in the hands of the receiver, March 18, 1895, when the trust company asserted its claim to the future income, a cash balance of $12,076.87, after paying $2,194.18 of the cost of said improvements, and after deducting the claim of O'Halloran, and all current operating expenses and obligations of the receivership, excepting the claim of Williams, and the taxes for 1895. The hydrants' rental then due and uncollected included South Topeka rental, $3,673.49, and city rental, $10,391.58. Thus the assets of the existing receivership susceptible of use in paying for improvements undertaken by it were approximately sufficient to complete payment therefor without resorting to the property or income covered by the trust company's mortgage lien. That the rental due from the city, other than the South Topeka rental, would eventually be awarded to Strong in his foreclosure decree, was not anticipated, and could not well have been. Considering the entire proceedings and the circumstances surrounding them, it cannot be said therefrom that the trust company is bound by the order of January 9, 1895, or by what was done thereunder, or that it expressly or otherwise assented that its vested mortgage lien be postponed or subordinated to the payment of the cost of these improvements, certainly not beyond any deficiency in the assets available for such payment, but not covered by its lien.

In Lackawanna, etc., Co. v. Farmers' Loan, etc., Co., 176 U. S. 298, 316, 20 Sup. Ct. 363, 370, 44 L. Ed. 475, it is said:

"This court has said that it is the exception, not the rule, that the priority of mortgage liens can be displaced. Kneeland v. American Loan & Trust Co., 136 U. S. 89, 98 [10 Sup. Ct. 950, 34 L. Ed. 379]; Thomas v. Western Car Co., 149 U. S. 95, 111 [13 Sup. Ct. 824, 37 L. Ed. 663]. We have said that priority of unsecured claims is recognized only in a few specified cases, in which equity and good conscience require that the vested liens of mortgage creditors shall be postponed in the application of current earnings to current debts. Sound principle forbids that a court of equity should imply an agreement upon the part of mortgage creditors to subordinate their claims to such debts as those due to the Lackawanna Company."

The debts there under consideration, and held inferior to the prior lien of a recorded mortgage, were for steel rails sold and delivered to the mortgagor, where the requirement for their use in replacing old and worn ones upon the mortgaged railroad was imperative, but "so extensive as to amount to reconstruction."

In Illinois Trust & Savings Bank v. Doud, 105 Fed. 123, 148, 44 C. C. A. 389, 414, 415, 52 L. R. A. 481, this court, after careful consideration of the rights of a mortgagee under a mortgage like the one here, said in conclusion:

"A mortgagee of the property, acquired and to be acquired, and of the income of a quasi public corporation, such as a railroad company, obtains a lien upon the net income of the company after the current expenses of operation incurred in the ordinary course of business are paid, and impliedly agrees that the gross income shall be first applied to the payment of these current expenses, before the net income to which he is entitled arises. * * * The class of claims which may be awarded a preference in payment over the prior mortgage debt in equity is limited to claims for current expenses incurred in the ordinary course of the operation of the mortgaged property within a limited time before the appointment of a receiver. It does not include claims for money loaned, or for material or labor furnished to make necessary beneficial and permanent additions or improvements to the mortgaged property. * * * The test of a preferential equity of a claim is its consideration. If its consideration was a current expense of the operation of the mortgaged property, which inured to its benefit, and which was incurred in the ordinary course of its business, within a limited time anterior to the appointment of the receiver, the claim may be preferred. The Supreme Court has refused to apply the principle of the civil and maritime laws of awarding priority to the last creditor who furnished repairs and supplies to a vessel to the distribution of the proceeds of the foreclosure of mortgages of quasi public corporations. Railroad Co. v. Cowdrey, 11 Wall. 459, 474, 482, 20 L. Ed. 199; Thompson v. Railroad Co., 132 U. S. 68, 74, 10 Sup. Ct. 29, 33 L. Ed. 256. If the consideration of a claim is not a part of the current expenses of the ordinary operation of the mortgaged property, but is a part of the expense of constructing a permanent addition or improvement to it out of the ordinary course of its operation, neither the fact that it tended to conserve and improve the property and increase the security of the mortgagee, nor the fact that it was necessary to keep the mortgagor a going concern, nor the fact that the mortgagor pledged or mortgaged the current income to secure it, will give the claim a preferential equity over the lien of a prior mortgage."

The claim there under consideration and held inferior to the prior lien of a recorded mortgage was for money loaned to the mortgagor to enable it to pay an installment of interest on the mortgage debt, and to construct an addition to the mortgaged electric plant.

These decisions are decisive of the present question. The difference that in each of them the claim denied priority in payment was incurred by the mortgagor, while here the improvements were made by a receiv-

ef under the court's authorization, is not material or controlling under the circumstances of this case.' Both decisions determine and declare the rights in mortgaged property and its income which vest in a mortgagee. These vested rights are not affected by a proceeding had, without notice to the mortgagee, in a receivership where he is not a party to the suit, and does not subsequently give express or implied assent to what is done. Kneeland v. Trust Co., 136 U. S. 89, 96, 100, 10 Sup. Ct. 950, 34 L. Ed. 379; Virginia, etc.; Coal Co. v. Central Railroad, etc., Co., 170 U. S. 355, 371, 18 Sup. Ct. 657, 42 L. Ed. 1068. The reconstruction, enlargement, or permanent improvement of mortgaged property by a court's receiver, under such circumstances, does not any more displace or postpone the prior mortgage lien than would the like act of the mortgagor in the absence of a receivership. '

' It follows that the cost of the new engine and additional wells incurred under the order of January 9, 1895, should be charged against the income earned prior to March 18, 1895, when the pledge of income in the trust company's mortgage became effective. The judgment creditors, Dana and Whiting, intervened in the receivership suit August 31, 1895, and the cost of these improvements, as an existing obligation of the receivership, was then a charge upon all the income not covered by the mortgage lien of the trust company, and therefore takes precedence over the equitable levy effected by their intervention.

. 7. The services of Williams, rendered after March 18, 1895, should be charged against the income subsequently earned, and his services prior to that date should be charged against the prior income. The same rule applies to the taxes. They were not payable until November, but, being for the entire calendar year, they could not equitably be charged upon the income for that month, or for a fraction of the year including that month, any more than they could be charged against the income for the particular week or day when they became payable. The nature of these expenses is such that, as between the parties to these appeals, they should be charged against current income. The taxes were, of course, a lien superior to all of the other claims.

. Under the rules here announced, the entire property and income will be taken in the satisfaction of receivership obligations and mortgage debts which are superior to the claims of Dana and Whiting. The decree of the court below is therefore reversed, with instructions to dismiss their intervening petitions.